[Civ. No. 60348. Second Dist., Div. Five. Oct. 16, 1981.]

In re the Marriage of SUSAN JANE and JOSEPH A. BRENNAN.
JOSEPH A. BRENNAN, Respondent, v.
SUSAN JANE BRENNAN, Appellant.

COUNSEL

Simon Taub and Neal Raymond Hersh for Appellant.

Laurence E. Clark for Respondent.

OPINION

HASTINGS, J.—Appellant Susan Jane Brennan (Susan) appeals from a denial of her motion to set aside an interlocutory judgment of dissolution of marriage (interlocutory judgment) on the grounds of extrinsic fraud. The respondent on this appeal is her former husband, Joseph A. Brennan (Joseph).

We commence with the facts as detailed by Susan in her opening brief on appeal because their accuracy is not challenged by Joseph.

Joseph and Susan were married on August 10, 1962, in Monrovia, California.

After a marriage of thirteen years and five months, and the birth of two children, Joseph H. Brennan, age eleven, and Keith S. Brennan, age eight, they separated on January 23, 1976.

On January 29, 1976, Joseph filed a petition for dissolution of the marriage, and listed in his petition that there were 15 items of community property and no separate property.

Susan was served with the dissolution papers in the early part of February 1976, along with an order to show cause restraining her from selling, transferring or disposing of community property.

Joseph contacted Susan and in substance stated the following:

A. "You don't have to hire an attorney."

B. "Why don't you come with me to the office of my attorney, Laurence Clark, and let's discuss the case with him."

C. "I am bankrupt. The assets, except for the residence listed in the petition are worthless. The shares of Graphic Marking and Graphic Marketing Service are not worth the paper they are written on."

D. "Let's go to Mr. Clark's office, my attorney, and whatever agreement you enter into will mean nothing, because I am doing all this to prevent you from losing the house where you and the children can live."

E. "If we don't proceed at once and make some kind of a deal my creditors will surely take away the house and you'll be out in the street."

Susan went to Mr. Clark's office in Monterey Park, California, and Mr. Clark, acting as her husband's attorney, made the following statements:

A. "I am going to be over fair with you."

B. "I am going to talk your husband into letting you live in the house until the youngest child becomes eighteen."

C. "At that time the house will be sold and you and your husband can divide the proceeds."

D. "I am the attorney for your husband's business and I can tell you that it's worthless."

E. "You will receive spousal support of $600.00 for one (1) year, and then $400.00 a month for two (2) years, and after that the Court will retain jurisdiction for three and one-half (3-1/2) more years, a total of six (6) years."

Susan asked Mr. Clark if that kind of support seemed sparse, and he responded: "That's all you would receive from the Court."

When Susan left the attorney's office she stated that she was displeased with what she had heard. Joseph then said: "Don't hire a lawyer, don't do anything. Go along with me and you won't be sorry. And if I go through this bad period now and the company becomes successful you won't be sorry. In fact, let's go to Court on February 17, 1976, which is the date set for the Order To Show Cause hearing, don't hire a lawyer and we'll hire a lawyer and we'll enter into an agreement, but it won't mean anything."

Susan appeared in court on February 17, 1976, without an attorney. Her husband was present with his lawyer, Mr. Clark, and they told the commissioner that the parties had entered into an agreement, and a complete stipulation settling the entire case, in which [*sic*] Mr. Clark and Joseph entered into the following colloquy.

"Q. Now, you're getting the stock of the two corporations, that is, Graphic Marking and Graphic Marketing; is that correct?

"A. Yes.

"Q. And you have a share, you're jointly and severally liable for that debt, to the best of your knowledge?

"A. Yes.

"Q. But the book value of that stock, both stock, at this time is zero?

"A. Right.

"Q. Has a negative book value."

The court then requested Mr. Clark to prepare an interlocutory judgment reflecting the stipulation of the parties to date, plus the little Chico property, and to submit it to Susan for her signature prior to presentation to the court. Thereafter, Laurence Clark sent a proposed judgment to Susan and Susan contacted her husband and told him that she was not going to sign the proposed judgment, and stated to her husband as follows:

"I don't think that I am protected if I sign that agreement."

Joseph then said to her: "Don't worry about what happened in Court. I'll advise Mr. Clark not to proceed, not to do anything. The whole matter will be dropped."

In April 1978, approximately two and one-half years after the parties appeared in court, Susan received in the mail a notice that the interlocutory and final judgment had just been entered. She contacted Joseph and asked him why she was receiving papers. He said: "Don't pay any attention to them, that's a mere formality."

In June 1978, two months after he had arranged to have the interlocutory and final entered, Joseph came to Susan and stated that he was ill with high blood pressure and wished to reconcile. Susan told him that she was delighted and they lived together full time as husband and wife from June 1978 until June 1979. ·

In June 1979, Susan and Joseph finally did separate. During the year that the parties were living together Joseph one day told Susan that the stock in his company was worth a minimum of $250,000. She said to him: "I thought the stock was worthless?" He said: "Well we got lucky and found some new investors."

On November 6, 1979, Susan filed a notice of motion to set aside and vacate the interlocutory judgment of dissolution of marriage on the ground of fraud.

As reported earlier Joseph's response does not challenge the accuracy of Susan's factual allegations. Instead it is more in the form of a declaration by Joseph's attorney, Laurence E. Clark. The gist of the response is that Joseph and Susan came to his office and told him that they had reached an agreement concerning division of their community property. Based upon this so-called agreement he prepared a proposed interlocu-

tory judgment of dissolution of marriage. On the day of trial Joseph, Susan and Mr. Clark appeared in court and Joseph took the stand. Under Mr. Clark's questioning Joseph stated that he and Susan had agreed to the terms of the interlocutory judgment and that in his opinion it was a fair and equitable division of the community property. The court then noted that Susan had not signed the proposed interlocutory judgment so she was asked if she read and understood it to which she responded "Yes." Susan was then asked by the court if she agreed to it and again her response was "Yes." The court then granted the interlocutory judgment.

## CONTENTIONS OF THE PARTIES

Susan on appeal argues that the above facts demonstrate that the interlocutory judgment was obtained through "extrinsic fraud" which she defines as conduct by Joseph and his attorney that deprived her of an opportunity to fully present her case in a court of law.

Susan is not seeking to set aside the dissolution of the marriage but only that part of the judgment awarding and dividing the community property and the support provisions.

Joseph contends Susan is not entitled to equitable relief because she had a reasonable opportunity to litigate her claims or defense. Any fraud occurring in the course of the action was intrinsic which does not entitle a party to equitable relief from the judgment.

## DISCUSSION

The two parties to this appeal have correctly stated the basic difference between extrinsic fraud and intrinsic fraud. The essence of extrinsic fraud is that a party has been denied by his opponent or otherwise an opportunity to be heard or to fully present a claim or defense. Intrinsic fraud or mistake on the other hand is not grounds for relief when such fraud or mistake "go to the merits of the prior proceedings, which should have been guarded against by the plaintiff at that time." (*In re Marriage of Wipson* (1980) 113 Cal.App.3d 136 [169 Cal.Rptr. 664].) While the distinction between extrinsic and intrinsic fraud is easily defined, the facts of a given case can often make it difficult to identify the fraud involved. This is the situation in our present case, however we are satisfied that extrinsic fraud does exist and that the motion should have been granted.

■ We first address the problem of independent representation in a marriage dissolution proceeding because of its continuous appearance in appeals where fraud is an issue.[1] When a fiduciary relationship exists between two parties and one gains advantage over the assets of another by way of a property settlement, gift, testamentary disposition or other means, the courts have uniformly held that independent legal advice to the disadvantaged party is not indispensable; however, it is a circumstance to be considered. (*Pfingst* v. *Goetting* (1950) 96 Cal.App.2d 293, 309 [215 P.2d 93].) Until 1975, California recognized that there was a fiduciary duty between spouses; however, the 1975 amendment to Civil Code section 5125 requires only that they act in good faith towards each other. In dissolution proceedings, the parties may elect to deal with each other at arms' length, and when they do so any fiduciary obligation otherwise owing is thereby terminated. (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 600 [153 Cal.Rptr. 423, 591 P.2d 911].) We do not believe this change in the duty owed by one spouse to the other necessarily modifies the above rule as stated in *Pfingst* v. *Goetting, supra*, 96 Cal.App.2d 293. In other words, we still agree that independent advice is not indispensable in a marriage dissolution proceeding, but it is a circumstance to be considered in determining whether fraud has been practiced on a disadvantaged party.[2]

"The extrinsic/intrinsic fraud rule is a doctrine developed in courts of equity governing the basis for successful collateral attack on a final judgment by way of an independent proceeding. The rule is that fraud internal to the adversary proceeding, such as perjury committed during trial or error or mistake during the trial, is intrinsic and is not a basis for relief; but fraud that prevented the trial of a claim or prevented the defrauded party from getting into court at all, is extrinsic to the proceeding and is a basis for relief. *Obviously, where there has been little or no judicial time invested in trial of a cause or an issue,* the factor of judicial economy which otherwise weighs in favor of finality is less strong, and the equitable considerations of fair hearing and of penaliz-

---

[1]This is not a case where Attorney Clark was representing both parties. For cases and comments on dual representation see 1981 California Family Law Practice (2d ed.) section 11, and *Klemm* v. *Superior Court* (1977) 75 Cal.App.3d 893 [142 Cal.Rptr. 509].

[2]We recognize that there are many fair and equitable marriage dissolutions that are handled by only one attorney. There can be numerous, justifiable reasons that are tailored to each situation. (See *Klemm* v. *Superior Court*, 75 Cal.App.3d 893, fn. 1, *supra*.) On the other hand, for the reason stated above, the warning sign is posted for all to see.

ing fraud weigh more compellingly." (*Los Angeles Airways, Inc.* v. *Hughes Tool Co.* (1979) 95 Cal.App.3d 1, 7 [156 Cal.Rptr. 805].) (Italics added.)

The court in *Pico* v. *Cohn* (1891) 91 Cal. 129 [25 P. 970, 27 P. 537] explains why extrinsic fraud justifies equitable relief, but intrinsic fraud does not: "What, then, is an extrinsic or collateral fraud, within the meaning of this rule? Among the instances given in the books are such as these: Keeping the unsuccessful party away from the court by a false promise of a compromise, or purposely keeping him in ignorance of the suit; or where an attorney fraudulently pretends to represent a party, and connives at his defeat, or, being regularly employed corruptly sells out his client's interest. . . .

"In all such instances the unsuccessful party is really prevented, by the fraudulent contrivance of his adversary, from having a trial; but when he has a trial, he must be prepared to meet and expose perjury then and there. He knows that a false claim or defense can be supported in no other way; that the very object of the trial is, if possible, to ascertain the truth from the conflict of the evidence, and that, necessarily, the truth or falsity of the testimony must be determined in deciding the issue. The trial is his opportunity for making the truth appear. If, unfortunately, he fails, being overborne by perjured testimony, and if he likewise fails to show the injustice that has been done him on motion for a new trial, and the judgment is affirmed on appeal, he is without remedy." (91 Cal. at pp. 133-134.)

Dicta in *In re Marriage of Connolly, supra,* 23 Cal.3d 590, is also in point. Relief from a judgment dissolving petitioner's marriage pursuant to Code of Civil Procedure section 473 (fraud resulting in excusable neglect or mistake) was denied her because petitioner (wife) had an attorney and the facts established that husband and wife chose to deal with each other as legal adversaries. During negotiations wife, as distinguished from our present case, never relied on any relationship of confidentiality or mutual trust. The court in distinguishing *Vai* v. *Bank of America* (1961) 56 Cal.2d 329 [15 Cal.Rptr. 71, 364 P.2d 247], stated (p. 601): "The present case differs. Here, after the dissolution action was filed, wife was never led to believe that she could or should rely on husband. The dispute over the property lasted almost three years, during which time wife and her counsel pursued their own independent investigation of the community property, . . ." The *Connolly* opinion does not disavow *Vai.* To the contrary it cites with approval a portion of *Vai*

that succinctly captures the concept of our ruling here. The court stated (p. 601): "'. . . "discovery is different from knowledge, [so] that where a party defrauded has received information of facts which should put him upon inquiry, and the inquiry if made would disclose the fraud, he will be charged with a discovery as of the time the inquiry would have given him knowledge." [Citation omitted.] "The circumstances must be such that the inquiry becomes a duty, and the failure to make it a negligent omission." [Citation omitted.] "Where no duty is imposed by law upon a person to make inquiry, and where under the circumstances 'a prudent man' would not be put upon inquiry, the mere fact that means of knowledge are open to a plaintiff, and he has not availed himself of them, does not debar him from relief when thereafter he shall make actual discovery." [Citation omitted.]' (P. 343.) Since the wife in *Vai* had been reasonably led by the affirmative actions of her husband to rely on him, under the circumstances she was not 'put on inquiry.'"

■ We are satisfied that Susan did not have a trial or "her day in court" within the meaning of the above cases, and others. It is true Susan appeared in court but not to engage in battle. Relief is denied for intrinsic fraud because the very object of the trial is to ascertain the truth from the conflict of evidence. (*Pico* v. *Cohn, supra*, 91 Cal. 129.) Susan, because of the representations of Joseph and his attorney, believed no trial was necessary. She was in court merely to put her stamp of approval on an agreement she briefly thought was fair due to her reliance on the representations made to her. In addition to Joseph's statements that they were bankrupt, that the business Graphic Marking and Graphic Marketing Services was worthless and that he was proceeding with the dissolution to prevent her from losing the house until the youngest child became 18, are the representations of Joseph's attorney. He said: "I am going to be over fair with you . . . . I am going to talk your husband into letting you live in the house until the youngest child becomes eighteen. . . . I am the attorney for your husband's business and I can tell you that it's worthless." When Susan questioned the fairness of the offered spousal support, he stated: "That's all you would receive from the court." Clearly these statements by Joseph and his attorney to Susan were designed primarily to prevent a trial of the issues normally contested in a dissolution proceeding. Although Susan was obviously naive in accepting their representations, this does not preclude her from raising the issue of extrinsic fraud. There was no meaningful judicial time invested in trial of a cause or an issue; therefore, as stated in *Los Angeles Airways, Inc.* v. *Hughes Tool Co., supra*, 95 Cal.App.3d

1, the equitable considerations for granting a hearing and penalizing fraud are quite compelling.

Joseph has relied heavily on a recent case by this division entitled *In re Marriage of Wipson, supra*, 113 Cal.App.3d 136, where we denied similar relief on the grounds that the fraud was intrinsic and not extrinsic. The case is inapposite for two compelling reasons: We stated (p. 142): "Usually when a party is represented by counsel and has the opportunity to appear and litigate his case, any fraud or mistake occurring in the proceeding is considered intrinsic. [Citation.]" Susan was without counsel and for reasons stated above she did not have the opportunity to appear and litigate her case.

Joseph next contends that the court was correct in denying Susan's motion because, like the wife in *Wipson*, she did not exercise due diligence in seeking relief. This is a puzzling argument in view of Joseph's rather strange behavior. To begin with, after the court hearing Joseph's attorney sent Susan a proposed judgment for her signature. She returned it to her husband stating that she did not think she would be protected if she signed the agreement. His response was, "Don't worry about what happened in court. I'll advise Mr. Clark not to proceed, not to do anything. The whole matter will be dropped." Joseph then waited approximately two and one-half years before entering the interlocutory and final judgment of dissolution. Two months after the judgment was entered Joseph returned to Susan stating he wished to reconcile. Susan was delighted and they lived together for one full year. It was close to the end of this one-year period that Joseph told Susan that the stock in his company had a minimum worth of at least $250,000. A few months later, and after Joseph had left, Susan filed her notice to set aside and vacate the interlocutory judgment. The picture that emerges is that Susan continuously placed a great deal of faith in Joseph's actions and representations. His delay in filing the final judgment and his return to Susan for one full year undoubtedly led Susan to believe that he was acting in good faith. She wanted to believe him. She wanted the marriage to continue. There was no compelling reason for her to take any legal action prior to the last separation at which time he told her about the value of the business.

Finally, Joseph contends Susan must show that a more favorable result would probably result in a trial of the issues. (*In re Marriage of Wipson, supra*, 113 Cal.App.3d 136.) Susan has made a prima facie showing in this respect. She had no hearing on her right to spousal sup-

port. Whether she gets more support or the same when this issue is actually tried is not the question. What is important is that she have her day in court on a matter that can *only* be determined by a court.

It is quite possible that the facts will establish that the stock of Graphic Marking and Graphic Marketing Service was valueless at the date of separation. On the other hand, it is also quite possible that evidence will establish it did have a market value. If this is the case, the division of the community property must be redetermined.

The judgment denying the motion is reversed.

Stephens, Acting P. J., and Ashby, J., concurred.