[Civ. No. 54187. First Dist., Div. Two. Nov. 30, 1983.]

Estate of T. TALBOT ANDERSON, Deceased.
BANK OF AMERICA, as Executor, etc., Petitioner and Appellant, v.
THOMAS E. ANDERSON et al., Objectors and Respondents.

## COUNSEL

Theodore Sachsman, Robert A. Padway and George M. Duff for Petitioner and Appellant.

Russell Millsap, Robert R. Millsap, Jr., Andrew Thompson, Jr., and Millsap, Millsap and Thompson for Objectors and Respondents.

## OPINION

**SMITH, J.**—Bank of America National Trust and Savings Association (bank) appeals from a judgment surcharging it, as executor for the estate of

decedent, T. Talbot Anderson, in the amount of $1,563,759 as damages to the estate. Respondents, objectors below, are Thomas Edward Anderson (Thomas) and James Talbot Anderson (James), sons of decedent and life beneficiaries under a trust established by decedent's will. In surcharging the bank, the court found that the bank acted imprudently in selling a portion of the estate and found that, due to the bank's acts of extrinsic fraud, objectors were not barred, by a prior order confirming sale, from challenging the bank's actions.

## BACKGROUND

Decedent died testate on May 3, 1972, leaving a wife, Julia Clair Anderson (Julia), and sons Thomas and James, issue of a prior marriage. Actuarial life expectancies at that time were about 10 years for Julia and 20 years for Thomas and James. By his will and codicil, decedent created a testamentary trust for the benefit of Julia, Thomas and James as life beneficiaries, with the adult issue of Thomas and James designated to take as remaindermen upon termination of the testamentary trust. As long as all three life beneficiaries live, the available balance of income and revenue under the trust is to be periodically disbursed to them in equal one-third parts.

The will names the bank as both executor and trustee and vests it with discretionary authority in both capacities to sell any property of the estate (except for certain oil, gas and mineral rights) without prior court order or directive. The will directs that all legacy, succession, inheritance, transfer and estate taxes be paid as expenses of administration and that the executor may not seek reimbursement for such expenses from any beneficiary.

The Anderson Ranch, covering over 13,300 acres in Glenn County, was the estate's principal asset and was appraised in the estate at $1.1 million, including improvements. The ranch, clear of indebtedness before decedent's death, was decedent's separate property. Liquid assets of the estate were community property and were valued at around $211,000. Under a five-year grazing lease of the entire ranch (except for reserved hunting and mineral rights) entered into by decedent commencing November of 1969, which lease provided for annual rent adjustments to the mutual agreement of the parties thereto, annual rent amounted to $60,169 at decedent's death. That rent represented an upward adjustment from an initial annual figure of $53,484. The Napa County home of decedent and Julia, held by them in joint tenancy, was valued at $45,000.

Appellant bank petitioned for and was granted an order for probate of the will and codicil, and for letters testamentary, on May 26, 1972, simulta-

neously obtaining an order for a family allowance of $1,000 per month for the maintenance and support of Julia.

In July, the bank obtained court authorization to enter into a lease with Sabre Exploration Corporation (Sabre) for production of oil, gas and other hydrocarbon substances on the ranch. Sabre paid the bank $26,741.82 on July 21st as the first year's minimum rent but terminated the lease the following year after finding no producible oil or gas.

An inventory and appraisement filed by the bank on December 7, 1972, showed a total of $1,292,533.95 in probate property (excluding the Napa County home's value), reflecting the inheritance tax referee's appraisal of the ranch at $1.1 million, and of cash, stocks, bonds and miscellaneous personalty at approximately $211,000.

On January 9, 1973, Thomas requested that special notice of all petitions, accounts and reports be given by serving such notice on the Woodland law firm of Millsap & Millsap, a professional corporation. (Prob. Code, § 1202.)

On or about February 1, 1973, the bank filed a federal estate tax return showing net taxes due in the amount of $339,731.41 based on a valuation of the ranch at $83 per acre. Included with the return was a $40,000 partial payment and a letter stating that the estate was not sufficiently liquid to pay the tax in full, stating that a sale of all or part of the ranch was being considered for that reason, requesting a one-year deferment and electing to make instalment payments on the balance. A subsequent partial payment made on June 6th left an unpaid balance due of about $273,716.

On February 16, 1973, the superior court ordered the executor-bank's first account and report settled, allowing over $25,000 total in statutory compensation and costs to executor and its attorneys. The order also authorized distribution of $10,000 to one Thomas Lew in accordance with a bequest in decedent's will.

On March 7th, the bank (as executor) filed a petition for preliminary distribution of $50,000 to itself as trustee under the will. All beneficiaries agreed to this in writing. Following court approval of the petition and establishment of the testamentary trust by court decree, $50,000 was distributed to the trust on April 23, 1973.

Meanwhile, on March 19th, the Internal Revenue Service (IRS) advised the bank-executor that, absent contrary notice from the IRS, the bank should assume that the IRS had accepted the bank's election to pay the estate tax

in 10 equal annual instalments, and that the next such instalment ($30,412.97 plus 4 percent interest on the unpaid balance) would be due on February 2, 1974.

The bank early on considered selling all or part of the ranch to pay the estate taxes. Decedent had briefly discussed this possibility with a bank officer prior to his death and opined that, if necessary, the land could be divided into two parcels of about 8,754 acres and 4,550 acres. He expressed his wish that only the smaller parcel be sold in that event. The bank ultimately put the larger parcel up for public sale but without prior mention of sale plans to the beneficiaries. A proposed meeting between the bank's agents and the beneficiaries to "resolve some of the problems we are having in closing the estate" never occurred despite prodding by both James and Thomas. Thomas specifically requested information about the estate and the proposed meeting. Further, objectors had previously declared their desire not to sell if sale could be avoided.

The grazing lease term was due to expire in October 1974. The bank had made no effort to renegotiate the existing $4.50-per-acre rent. By October 1974, the bank could reasonably have expected to get $6 per acre, amounting to about $78,000 annual rent.

Commencing on November 1, 1973, the bank marketed the larger (8,754-acre) ranch parcel, disseminating among prospective buyers a brochure setting forth an asking price of $150 per acre. At that time—about nine months after filing the federal estate tax return and eighteen months after decedent's death—the bank knew of a pending IRS audit, expected the property to be revalued at $100 to $120 per acre, and knew from discussions with the IRS audit attorney that the IRS would assess the property at its actual sale price. A copy of the sale brochure was delivered to the audit attorney. The bank at no time prior to sale consulted a qualified appraiser.

In a letter of November 1, 1973, Thomas sought information on a proposed meeting between family members and the bank's attorneys. By a response letter of November 7th, the bank informed objectors for the first time that a sale of ranch property was pending. The letter invited them to attend the bid opening scheduled for December 12th and included the listing information.

Serious thought was not given to the possibility of borrowing money to avoid sale of the property because the executor believed that a sale on an instalment basis would generate more income in succeeding years for the beneficiaries than would borrowing to fund estate obligations. However, no cash flow analysis of the estate or investigation into the possibility or desir-

ability of borrowing in lieu of selling was conducted. Potential tax consequences of the sale were not determined prior to sale.

Bids were opened as scheduled, and one (the Carter bid) which offered a total purchase price of $1.16 million, with down payment of $360,000 and annual payments of over $75,000 per year plus 7 percent interest over the next 20 years, was selected. Thomas attended the bid opening.

The bank filed a petition to confirm the sale, and a hearing was set for February 1, 1974. The bank failed to give special notice to objectors' counsel as requested by Thomas. Instead, informal letters were sent to all beneficiaries advising of the scheduled hearing. The bank, subsequent to the hearing, obtained a written waiver of special notice from Thomas.

At the hearing, the bid was increased and the property sold for a total sum of $1,475,000 with a cash down payment of $457,250 together with a promissory note for the balance bearing 7 percent interest, secured by a first deed of trust, and providing for 20 equal yearly installment payments. This reflected a per-acre value of about $168 for the sold portion.

On February 5th, the IRS advised the bank in a letter that the sold parcel would be valued at $168 per acre and the unsold parcel at $135 per acre—a tax total of $691,914. The resulting deficiency assessment was thus $352,183 (the amount over the $339,731 appraised value as filed). The order confirming sale had not yet been signed, yet the bank disclosed the IRS revelations to neither the court nor objectors. Objectors and their attorney first learned of the tax consequences when they received the executor's second account on or about July 15, 1974, after the order confirming sale had become final. The second account and report was ordered settled on October 3, 1974, without objection, although objectors' attorney complained about the handling of the estate administration in a letter to bank agents.

On February 20th, the IRS advised the bank that the sale did not qualify as an instalment sale because the down payment was in excess of 30 percent, actually being 31 percent. Consequently, the entire balance of the sale price in excess of the federal estate tax valuation was taxable as capital gains and became immediately due and payable. The executor, relying on the advice of its agents, erroneously believed that the sale would qualify as long as the *net* down payment did not exceed 30 percent. The executor never investigated the possible tax effects of transferring the total ranch property into the trust before the attempted instalment sale. The estate also lost the benefit of the deferred 10-year instalment plan for payment of the estate taxes because the sale exceeded 50 percent of the realty.

In a meeting with an IRS attorney held on March 25, 1974, to discuss the tax audit and deficiency assessment, the bank was granted a reduction in appraised value on the unsold property from $135 to $120 per acre but agreed to the $168-per-acre valuation on the sold property. As so valued the federal estate tax liability became $653,128. A prior IRS lien restriction imposed by letter dated January 18, 1974, conditioned release of the unsold property on payment of the sale down payment (less expenses directly related to the sale) toward the taxes due, and on application of all payments from the note and deed of trust toward the balance until paid off. This would have left only the rental income on the unsold property available for expenses of administration. The bank agreed to the $120- and $168-per-acre values in return for a modification of the lien. On April 1st, the IRS released the lien on the sold property (retaining it on the unsold property) on condition that $345,000 (72.59 percent of the down payment of $457,250) be paid to the IRS. A further condition required payment of all annual instalments from the sale to the IRS, less necessary trust administration expenses and distribution to the life tenant of sums in the amount received before sale.

By accepting the IRS valuation, the bank waived any right to appeal within the IRS, or to the federal tax court or district court. Despite readiness of the IRS to discuss the $168-per-acre valuation of the sold parcel, the bank did not pursue the matter. The $168-per-acre valuation reflected a sale occurring 20 months after the date of death, and after a period of substantial appreciation. The *state* appraisal of the entire ranch property was, by contrast, only about $83 per acre. Acceptance of the IRS valuation had the further effect of releasing more liquid assets for administration expenses. The existence of the tax lien was not disclosed to the beneficiaries before the bank's acceptance of the IRS valuation. After close of the audit, it ultimately became necessary for the bank to obtain hardship extensions from the IRS for four consecutive years, to borrow about $100,000 from Bank of America and to borrow $25,000 from decedent's widow, Julia. Following the audit, the estate was assessed additional state pickup taxes and interest of $48,332, plus state capital gains and preference taxes totaling about $63,000.

As a direct result of the sale, estate obligations (including interest) increased by more than $558,000, which figure, when added to the unpaid balance of federal estate taxes already due prior to sale, left postsale estate obligations totaling about $823,000 as against a down payment figure of $457,250.

On April 8, 1975, the bank filed a third account and report, to which Thomas and James filed objections. The bank twice successfully demurred

before its later demurrer to amended objections was finally overruled by an order filed March 23, 1977.

Trial before the Honorable Prentiss Moore commenced on February 13, 1980, and the taking of evidence concluded on March 3, 1980, after 12 trial days. Following filing of the court's intended decision and voluminous signed findings of fact and conclusions of law, the court's judgment in favor of objectors was entered and noticed on October 22, 1980. Notice of appeal from the judgment was timely filed on November 6, 1980.

In its judgment, denominated "Order After Hearing Objections to Third Annual Account and Report," the court (1) concluded that because of the executor's acts of extrinsic fraud, no part of the order confirming sale was binding on objectors as to "the advantage, necessity, benefit and propriety" of the sale, (2) ordered the bank to pay the sum of $1,563,759 as damages, (3) ordered the bank to pay attorney fees and costs, (4) ordered the bank to file a final accounting as executor, and (5) removed the bank as testamentary trustee, "to serve only pending the appointment of a nominee of the beneficiaries. . . ."

## APPEAL

### I.

Initially, the parties concur that the order confirming sale, an appealable order (Prob. Code, § 1240, subd. (g); Code Civ. Proc., § 904.1, subd. (k)) from which no appeal was taken, became final 60 days after its entry on March 5, 1974, and was thus res judicata as to the issue of the executor's prudence in selling the property (*Estate of Wemyss* (1975) 49 Cal.App.3d 53, 58 [122 Cal.Rptr. 134]; see *Fairchild* v. *Bank of America* (1958) 165 Cal.App.2d 477, 483 [332 P.2d 101]) absent intervention of equity upon a finding of extrinsic fraud. (*Morales* v. *Field, DeGoff, Huppert & MacGowan* (1979) 99 Cal.App.3d 307, 313 [160 Cal.Rptr. 239].) Respondents' challenge was, of course, allowed by the trial court upon such a finding, relieving them of the order confirming sale.

Appellant bank, however, urges that the subsequent order settling second account, which was separately appealable (Prob. Code, § 1240, subd. (k)), acts as a further res judicata bar because the order became final without challenge, the second account and report mentioned the sale, and the order ratified, confirmed and approved "all of the acts and transactions set forth in said account and report. . . ." But such language is not necessarily confirmation of a prior sale, even though the order may approve fees for that sale (*Estate of Matthew Delaney* (1874) 49 Cal. 76, 85), and, more-

over, the question of a sale's validity may not be reopened in a subsequent accounting once an order confirming that sale has become final (*Estate of Gump* (1940) 16 Cal.2d 535, 549 [107 P.2d 17]). Appellant's cited authorities are inapposite.

Therefore, the order approving second account did not embrace the issues presented here, and failure of objectors to obtain equitable relief from that order is of no consequence. Any issue of fraud or negligence on the part of the bank was subject to resolution in the prior order confirming sale (see *Perna* v. *Bank of Amer. N. T. & S. Assn.* (1938) 28 Cal.App.2d 372, 376 [82 P.2d 605]); "the settlement of an account is not conclusive except as to such items as are included in it *and are actually passed upon by the probate court*. [Citations.]" (*Estate of de Laveaga* (1958) 50 Cal.2d 480, 487 [326 P.2d 129]; italics added.)

## II.

Justice Traynor outlined California law on extrinsic fraud applicable to this case in the following two case excerpts.

■ "The final judgment of a court having jurisdiction over persons and subject matter can be attacked in equity after the time for appeal or other direct attack has expired only if the alleged fraud or mistake is extrinsic rather than intrinsic. [Citations.] Fraud or mistake is extrinsic when it deprives the unsuccessful party of an opportunity to present his case to the court. [Citations.] If an unsuccessful party to an action has been kept in ignorance thereof [citations] or has been prevented from fully participating therein [citation], there has been no true adversary proceeding, and the judgment is open to attack at any time. A party who has been given proper notice of an action, however, and who has not been prevented from full participation therein, has had an opportunity to present his case to the court and to protect himself from any fraud attempted by his adversary. [Citations.] Fraud perpetrated under such circumstances is intrinsic, . . ." (*Westphal* v. *Westphal* (1942) 20 Cal.2d 393, 397 [126 P.2d 105], citing in part to *United States* v. *Throckmorton* (1878) 98 U.S. 61 [25 L.Ed. 93], and *Caldwell* v. *Taylor* (1933) 218 Cal. 471 [23 P.2d 758, 88 A.L.R. 1194].)

■ "The terms 'intrinsic' and 'extrinsic' fraud or mistake . . . do not constitute, however, a simple and infallible formula . . . . [Citations.] It is necessary to examine the facts in the light of the policy that a party who failed to assemble all his evidence at the trial should not be privileged to relitigate a case, as well as the policy permitting a party to seek relief from a judgment entered in a proceeding in which he was deprived of a fair opportunity fully to present his case. [¶] The latter policy applies when a

party's adversary, in violation of a duty arising from a trust or confidential relation, has concealed from him facts essential to the protection of his rights, even though such facts concerned issues involved in the case in which the judgment was entered. . . . In this state equitable relief has been granted from final judgments settling the accounts of guardians, administrators, or executors who withheld information that would have enabled the beneficiaries to attack the accounts [citations]. The same principle applies to decrees distributing the estate of a decedent adversely to the rights of beneficiaries who have been precluded from pursuing their rights by concealment of facts by the fiduciary [citations] and to other probate decrees obtained under similar circumstances. [Citations.]" (*Jorgensen* v. *Jorgensen* (1948) 32 Cal.2d 13, 19-20 [193 P.2d 728].)

 Applying the above rules, we uphold the trial court's findings of extrinsic fraud. Further, appellant's attack on the sufficiency of the evidence is meritless. Acts of the bank constituting extrinsic fraud, in the judgment of the court below, included the concealment from objectors and the court of material facts in three communications.

The first was a letter sent to objectors on November 7, 1973, in response to a letter from Thomas in which he asked for a meeting between objectors and bank representatives and attorneys designed to remedy objectors' "complete ignorance as to the problems regarding the settling of the estate, . . ." The bank's letter advised objectors, for the first time, that a sale was pending, that they were welcome to attend the upcoming December 12th bid opening and to come early to discuss any questions they had. The letter stated that if an earlier meeting were arranged, the bank's attorneys would be unable to attend. Further, the letter advised that the primary problem delaying settlement of the estate was payment of outstanding federal estate taxes but that "the sale of the real property, if successful, will raise the necessary cash to meet this obligation." Not by that letter or at any subsequent time did the bank advise objectors that the federal estate tax audit was pending, that the audit could result in higher valuation, or that sale of the property could generate California capital gains and pickup taxes.

The second communication was the bank's procurement from Thomas of a written waiver of special notice as to the hearing on return of sale. Instead of sending special notice to Thomas' attorney as requested, the bank representative chose to send a letter directly to objectors notifying them of the hearing set for February 1, 1974, and stating, "Our attorney, Duard Geis, feels there may be some upbids and it could be quite an interesting morning. You are certainly welcome to attend if you wish." (Objectors' attorney was first notified of the sale only after the fact, i.e., upon the filing of the second account on July 15th, when the order confirming sale was already final.)

The bank procured Thomas' written waiver without explaining any adverse tax consequences from the sale, which consequences, the trial court found, were by then evident to the bank. The court found extrinsic fraud in failure to disclose material facts to objectors while "studiously avoid[ing]" their attorney, who might otherwise have become aware of the situation and protested. Thus, the court reasoned, the acts thwarted objectors' desire to preserve the estate and was tantamount to depriving them of their day in court. Thomas showed up at the hearing but made no appearance and did not participate.

The third communication was the following representation in the bank's return of sale: "[I]t is for the advantage, benefit and best interest of [the] estate, and all persons interested therein, that [the] real property, hereinafter described, be sold, as otherwise sufficient funds will not be available with which to pay estate and inheritance taxes, costs, charges, and expenses of administration required in closing [the] estate."

Extrinsic fraud is supported by findings that the bank had deliberately either misstated, or failed to state, the following material facts: the failure by the bank to calculate the tax consequences of the sale; the loss of the 10-year instalment deferment plan; the increase in estate taxes caused by the sale being far in excess of the down payment received from the sale; and, the knowledge by the bank that the estate obligations could not be discharged as represented. Further, the bank was notified by the IRS four days after the hearing, and before the order was signed, that the new valuation would be $168 per acre on the sold parcel and $135 per acre on the retained parcel, yet no disclosure of this development was made until after the confirmation of sale had become res judicata.

As a matter of law, these representations constitute extrinsic fraud. The confidential relationship between the executor bank and objectors is undisputed, as is objectors' reliance on that relationship. ■ " 'The failure to perform the duty to speak or make disclosures which rests upon one because of a trust or confidential relation is obviously a fraud, for which equity may relieve from a judgment thereby obtained . . . .' (3 Freeman, Judgments (5th ed.), p. 2576; . . .)" (*Jorgensen* v. *Jorgensen, supra,* 32 Cal.2d 13, 19; see *Goldberg* v. *Goldberg* (1963) 217 Cal.App.2d 623, 630 [32 Cal.Rptr. 93].) ■ The waiver of notice by Thomas does not remove the fraud, because the waiver itself was a product of the fiduciary's less than candid representations which circumvented Thomas' designated attorney. (*Goldberg, supra,* 217 Cal.App.2d at pp. 635-636.) Also, Thomas' actual attendance at the hearing without counsel after such misrepresentations does not preclude a finding of extrinsic fraud. (*In re Marriage of Brennan* (1981) 124 Cal.App.3d 598, 606-607 [177 Cal.Rptr. 520].) Finally, "It must be

remembered that statements of false conclusions of fact or law made by a fiduciary to a beneficiary are condemned equally with untrue factual statements. [Citations.]" (*Goldberg, supra,* 217 Cal.App.2d at p. 636.)

Appellant does not challenge the facts as found by the court below concerning the bank's actual or chargeable knowledge. Rather, bank argues that there is no extrinsic fraud present and that objectors, therefore, have no basis upon which to attack the order confirming the sale. The bank points to objectors' knowledge of the hearing date as giving them an opportunity to attend the hearing on the petition to confirm the sale. It also stresses that Thomas' presence at the hearing "waives any defect there may have been in the giving of notice to him."

The legal rationale for the bank's position is the strict extrinsic-intrinsic distinction articulated in *United States* v. *Throckmorton* [98 U.S. 61 (25 L.Ed. 93)] where, according to the bank's paraphrase, the party claiming extrinsic fraud must show that he or she "never had knowledge of the suit" or was "denied his or her 'day in court.' " Bank states that Thomas' "opportunity to object to this sale arose before, during and even after the hearing confirming it, when the Bank's counsel advised him by letter that the formal notice of the hearing on the confirmation proceedings conforming with the requested special notice had not been given."

The bank's reasoning is defective because it ignores the fiduciary relationship between it and the objectors. A special or fiduciary relationship dictates full and complete disclosure, and short of it, a finding of extrinsic fraud is required. (*Jorgenson* v. *Jorgenson, supra,* 32 Cal.2d 13, 19-20.) It is inescapable that the acts of the bank here in failing to disclose material information, coupled with its avoidance of objectors' attorney, in effect prevented objectors from discovering and presenting the full case in support of their interests. Even under the strict view of extrinsic fraud annunciated in *Throckmorton,* objectors were denied a meaningful "day in court" and their "knowledge of the suit" was tainted by the bank's outrageous conduct.

For its sufficiency of the evidence claim, the bank challenges only one of several findings of extrinsic fraud—the finding with respect to the representation, made in the return on sale, that the sale was necessary and would furnish the needed cash to meet the estate's obligations. The bank characterizes the representation as a "clear and honest opinion" by an executor relying on the misadvice of counsel. The argument must be rejected, however, for it essentially holds for a "good faith" exception to chargeable knowledge. ▮▮▮ ▮▮▮▮ Good faith will shield an executor charged with knowledge reasonably required of it in discharging its fiduciary duties only where the executor is free of negligence. (*Estate of Beach* (1975) 15

Cal.3d 623, 639 [125 Cal.Rptr. 570, 542 P.2d 994].)[1] Appellant has failed to demonstrate the alleged insufficiency.

## III.

The bank next contends that the court's conclusion that the decision to go to sale was imprudent is unsupported. The argument, as presented in appellant's opening brief (no closing brief was filed), has two subparts: (1) objectors failed to establish the executor's imprudence with requisite expert testimony; and (2) the executor's alternative to sale—i.e., taking out a loan of $400,000—was not viable, and the court's conclusion as to imprudence cannot stand without that alternative.[2]

For its first point, the bank relies upon the following passage from *Estate of Beach, supra,* 15 Cal.3d 623, at page 635: "[A]s a professional fiduciary [a bank's] liability must be determined by more stringent standards than would the liability of a lay executor. Those undertaking to render expert services in the practice of a profession or trade are required to have and apply the skill, knowledge and competence ordinarily possessed by their fellow practitioners under similar circumstances, and failure to do so subjects them to liability for negligence. [Citations.] Proof of liability for failure to possess or exercise these professional attributes requires the testimony of a qualified expert where the claimed injury and its causes are beyond common knowledge. [Citations.]" The bank insists that there was no competent proof to support a finding of imprudence because objectors failed to present expert testimony on that point. On the other hand, the bank offered expert testimony that the executor's action was prudent. We conclude that expert testimony was not required and that there was hence no failure of proof.

As recognized in *Estate of Beach, supra,* the need for expert testimony arises only "where the claimed injury and its causes are beyond

---

[1] "[A]n executor or administrator is not liable for any decreases in the value of estate assets on account of his acts or omissions done in good faith *and without negligence.* [Citations.]" (*Estate of Beach, supra,* 15 Cal.3d 623, 639, italics added; Prob. Code, § 920.) The bank's negligence in relying on the advice of counsel is implicit in the following trial court finding (No. 54): "The executor *through its inept agents erroneously believed* that an installment sale required not more than a net thirty percent (30%) as down payment . . . . The executor's conduct in this respect constituted gross negligence and incompetence." (Italics added.) It may be, too, that the court was not finding the executor's reliance on the agents to be negligent, but was instead imputing to the executor the negligent acts of its agents. Either way, the executor was found negligent.

[2] The trial court found as follows: "Instead of going to sale the executor could have obtained a loan for $400,000.00, amortized over a period of 40 years at an annual interest rate of [8.5%] with an annual payment of principal and interest of $35,090.00 for a payment of taxes, and all costs of administration. Such a loan was available at that time from the Willows office of the Federal Land Bank Association."

common knowledge'' (15 Cal.3d 623, 635 [selection of unproductive stock as suitable for inclusion in trust rather than selling same, where company showed no signs of deterioration]; cf. *Alhino* v. *Starr* (1980) 112 Cal.App.3d 158, 176 [169 Cal.Rptr. 136] [possible attorney negligence in settling action where extensive investigation into first or second deeds of trust as alternative security settlements would have been required]); conversely, expert testimony is not required where a question is resolvable by common knowledge (*Jorgensen* v. *Beach 'n' Bay Realty, Inc.* (1981) 125 Cal.App.3d 155, 163 [177 Cal.Rptr. 882] [negligence characterized by concealment of facts by a fiduciary, in violation of statutory duty]). ▮ Moreover, although a bank *may* be held to the higher standards of a professional fiduciary, it may certainly be tested under the lower standard applicable to executors in general, and that is, " 'that degree of prudence and diligence which a man of ordinary judgment would be expected to bestow upon his own affairs of a like nature.' " (*Estate of Beach, supra,* 15 Cal.3d at p. 631, quoting from *Estate of Moore* (1892) 96 Cal. 522, 525 [31 P. 584].) In applying that lower "man of ordinary judgment" standard, expert testimony is not required.

The bulk of the lower court's numerous findings material to imprudence required no more than common knowledge to determine. The executor was variously found negligent, grossly negligent, incompetent or imprudent for the following acts or omissions bearing on the sale: failure to ever conduct a cash flow analysis to determine the need to go to sale; proceeding to sale without conferring with the beneficiaries; divulging sale plans and the asking price to the IRS with knowledge of a pending audit; accepting the Carter bid without computing its potential effect on cash flow; not considering possible tax consequences flowing from a sale, especially when an audit was pending; failure to renegotiate the grazing lease yearly, as provided for in the lease, and thus maximize income; failure to investigate the possible advantage or availability of a loan; and agreeing to an IRS valuation of $168 per acre on the sold parcel at a time when the state tax appraisal was set at only $83 per acre, and when the federal valuation was based on a sale which followed the referential date of death by twenty months in a rising realty market. The thrust of these determinations is, as stated in one finding, "The defendant Bank's conduct in administering the . . . estate up to the date of signing the order confirming sale on March 5, 1974 demonstrated both gross ignorance and gross negligence," and the bank "failed to give the slightest degree of skill or expertise in the discharge of its duties as executor." In making the findings noted above, the trier of fact was not called upon to decide *which* of several options, tax consequences, lease terms or cash flow alternatives were prudent or imprudent. The issue was the bank's prudence in proceeding to sale in *disregard* of alternatives and consequences about

which a lay person possessing common knowledge would wonder and think to inform him or herself.

Various other findings do go to specific knowledge which a professional fiduciary should possess and arguably required expert testimony, but they are unnecessary to the court's conclusion that the bank acted imprudently since the conclusion is manifestly correct by application of a lay standard.

We hold that imprudence was competently proved without the need for expert testimony.

The bank's second argument must be rejected as irrelevant to its attack on the imprudence determination. As discussed above, the bank's action in selling without regard for important consequences and alternatives was imprudent, and that is so whether or not viable alternatives existed. Had the bank prudently investigated the possibility of borrowing as an alternative to selling, the "viability" of that alternative would be relevant to the prudence of its decision whether to select that alternative over another, but as the trial court found, "[t]he executor failed to make any [such] investigation . . . i.e. (1) the possible source of a loan, (2) length of the loan, (3) amount of loan, and (4) possible interest rates." The viability of borrowing would have relevance in this case to the issue of proof of damages since the court's calculation of loss to the estate was predicated in part on the availability of a $400,000 loan (see fn. 2, *ante*), but such an argument is not raised.

## IV.

The trial court computed damages in the following manner. First, it measured loss of the sold parcel itself at $885,160 by subtracting consideration received from the sale from the property's value at the date of trial. Second, it calculated net loss of income from the date of sale to the date of trial at $72,000, utilizing a constant rental value of $10 per acre for the six-year period. Third, the court determined net increases in taxes, fees, commissions and costs of sale at $690,473, assuming an appraisal value of $100 per acre for federal estate tax purposes. From the total of those three elements ($1,647,633) the court deducted total increased expenses, to the date of trial, which would have resulted from retention of the property and borrowing $400,000 on a long term loan[3] ($83,874) and thus arrived at a net damages figure of $1,563,759. The bank raises three asserted errors in the determination.

As one argument, the bank maintains that loss of income to the life beneficiaries is unsupported in fact because it "relies on hindsight findings"

---

[3]See footnote 2, *ante.*

and assumes a stable IRS interest rate of 4 percent on the deferred federal estate tax whereas the interest rate in fact fluctuated frequently between the dates of sale and trial. The "hindsight" complaint permeates appellant's brief and has no evident legal significance. As for the claimed interest rate fluctuations, appellant does not show how it is prejudiced by the asserted error, no computations are offered to reflect how the trial court's painstaking arithmetic calculations might be altered, and we are not even guided to places in the record where the relevant calculations can be found.

■ As a second point, the bank argues from the evidence that increased taxes were attributable to postsale negotiations with the IRS rather than from the sale itself and that the increases were thus not damages caused by the sale. The trial court expressly found otherwise, and the bank does not attempt to lay out the evidence necessary to attack that finding on insufficiency grounds. We are not at liberty to reweigh the evidence (*Campbell* v. *Southern Pacific Co.* (1978) 22 Cal.3d 51, 60 [148 Cal.Rptr. 596, 583 P.2d 121]) and have no obligation to independently search the record.

■ The third point raised by the bank is that there is no basis in California law for an award of so-called "appreciation damages" as was allowed here in assessing the loss to the estate of the sold property. We hold that California law is not as restrictive as the bank urges, and find that the award in this case does not offend against reasonableness or any other policy of recovery.

Instead of charging the executor for the value of the property *at the time of sale* and adding simple, legal interest of 7 percent per year to the time of trial (as the bank impliedly urges should have been done), the court used the value of the property *as of the time of trial* including amounts which the property may reasonably be said to have appreciated in value since the sale. Utilizing alternative computation methods—a present value analysis and a figure derived from an appreciation rate of 8.5 percent per year, noncompounded—the court reached a compromise value of $885,160. The bank does not argue that the property's value at trial was any less or that the methods of valuation employed were unreasonable. It maintains, rather, that appreciation damages are precluded in this state as a matter of law.

The only California case cited in support of this proposition is *Estate of Talbot* (1956) 141 Cal.App.2d 309 [296 P.2d 848, 58 A.L.R.2d 658]. It is distinguishable on its facts and contrary to the bank's position in principle. In *Talbot,* a trustee possessing discretionary sale power under a trust sold certain trust stocks, acting in good faith but in breach of trust. In ordering the objectors "made whole" for the resulting loss, the trial court allowed appreciation damages to the time of trial and, further, reserved jurisdiction

to determine and allow future appreciation until termination of the trust. (*Id.*, at pp. 320-321.) The appellate court reversed in part, concluding that Civil Code section 2238, which provides that a trustee who makes unauthorized but good faith dispositions of trust property "is liable only to make good whatever is lost to the beneficiary by his error," must be interpreted— at least in the absence of a breached duty of loyalty or duty to retain specific assets (Rest.2d Trusts, §§ 205-206, 208)—to limit liability to loss to the corpus plus interest, and to exclude loss of income and appreciation. (*Estate of Talbot, supra,* at pp. 326-327.)

In the present case, by contrast, the executor has been found to have breached its duty of loyalty in several respects, and those findings are not challenged. Thus, the *Talbot* holding or rationale in no way precludes appreciation damages here. In fact, the *Talbot* court commented on the "make good" language of Civil Code section 2238 as follows: "[E]ven though the breach [of trust] is one made in good faith, it may constitute a breach of loyalty. . . . In such cases the trier of the fact should have some discretion to fix the damages in accordance with the nature and degree of the breach. . . . Thus, what constitutes making 'good' the loss may vary according to the circumstances." (*Estate of Talbot, supra,* 141 Cal.App.2d at p. 323.) We conclude that the *Talbot* case supports rather than precludes the inclusion of appreciation damages in this case.

Further support can be found in the general tort measure of damages found in Civil Code section 3333 since this case presents elements of tortious nondisclosure and fraud. In such a case, the measure of damages is "the amount which will compensate for all the detriment proximately caused thereby. . . ." Given the history and use of the subject real property, objectors would probably have retained it in the family at least long enough to enjoy its appreciated value to the time of trial. Moreover, the use of an 8.5 percent annual appreciation figure was in accord with substantial justice, being reasonable and consistent with the marketplace rather than unconscionable or grossly oppressive. (Civ. Code, § 3359.)

V.

Appellant's remaining two contentions relate also to the damages award and are meritless.

First, it is urged that damages should have been awarded only to the extent of Thomas' and James' interests as life beneficiaries since Julia, the third life beneficiary, did not file objections in this action and, due to her shorter life expectancy, had a different interest in the estate—that of maximizing distributable income as fast as possible. By similar reasoning, the bank

would limit damages to loss of *income* between the sale and trial, allegedly $72,000, and deny recovery for the damages caused to remaindermen by the sale.

Again, the only authority cited by the bank is *Estate of Talbot, supra,* a case which does not support the contention. In that case, it is true, damages were awarded only to the extent of an objecting income beneficiary's interest. But the action was against a *trustee* of a testamentary trust following distribution of the subject assets to the trustee, not against an *executor* administering those assets, and the nonobjecting beneficiaries had given written consent to the trustee regarding the challenged transaction. (141 Cal.App.2d 309.)

■ The bank cites no authority, and our own research discloses none, that limits recovery in an action against an executor to the interests of objecting parties. Moreover, the myriad duties of an executor illustrate that an executor—in contrast to a trustee, "whose primary mission is to serve the trust beneficiaries" (*Estate of Beach, supra,* 15 Cal.3d 623, 638)—is responsible for the entire estate and to all persons interested therein. (See *ibid.*) Thus, an executor is answerable to the court which, in the exercise of its supervisory function "to protect the estate, and, as far as may be, the rights of *all* concerned" (*In re Sanderson* (1887) 74 Cal. 199, 208 [15 P. 753]; italics added), may examine the executor even where *no* persons interested in the estate file objections. (*Ibid.*)

■ The bank's second and last remaining contention is that the trial court improperly included in its damages calculations the sum of $21,308, representing an increase in statutory executor's commission and attorney fees previously claimed and allowed but as yet not taken. The validity of that prior allowance is unaffected by the instant action, and thus the sums allowed may presumably be taken in the future. It was therefore a proper element of damages, but one which is, of course, subject to a claim of offset against the judgment herein if not taken.

## DISPOSITION

We find the trial court's finding of extrinsic fraud is supported by the law and facts so that objectors were correctly relieved from the res judicata effects of the May 5, 1974, order confirming sale; the finding of imprudence is similarly supported in law and fact; and damages were correctly assessed in all respects here challenged.

Accordingly, the judgment (order after hearing objections to third annual account and report) is affirmed.

Rouse, Acting P. J., and Miller, J., concurred.

A petition for a rehearing was denied December 29, 1983, and appellant's petition for a hearing by the Supreme Court was denied February 22, 1984.