[No. A028993. First Dist., Div. Three. July 18, 1989.]

In re the Marriage of DEANNA J. and ALDIS BALTINS.
ALDIS BALTINS, Appellant, v.
DEANNA J. BALTINS, Respondent.

COUNSEL

Duncan M. James, Joseph A. Piasta II and O'Brien, Watters, Davis, Malisch & Piasta for Appellant.

Robert A. Fowler and Fowler & Ball for Respondent.

OPINION

BARRY-DEAL, J.— ■ ■■ ■ ■ Aldis Baltins (Husband) appeals from the order granting the motion of Deanna Baltins (Wife) to set aside the property and support provisions of the interlocutory and final judgments of dissolution of marriage on the grounds of duress and extrinsic fraud or mistake.[1] He contends that the order was not supported by the evidence and was contrary to the law, and that the court erred in refusing to prepare a statement of decision. Husband also challenges a subsequent order granting Wife's motion for modification of support, claiming that the marital settlement agreement provided for nonmodifiable support and that trial court action was stayed under Code of Civil Procedure section 916 by his first notice of appeal. We affirm both orders.

## I. *Factual and Procedural History*

Husband and Wife were married on June 7, 1969, and separated on January 7, 1982, a period of 12 years and 7 months; they had one adopted child, born October 31, 1978. At the time of their marriage, Husband was in his senior year in medical school, and Wife was working as a secretary; following Husband's internship, they moved several times while he completed his residency in orthopedics. In 1975, the couple moved to Ukiah, where Husband became board certified in orthopedic surgery and began his private practice. Until 1978 when their child was born, Wife worked at

---

[1] In her notice of motion, Wife specified that she was moving to set aside those portions of the interlocutory and final judgments which divided the community property and provided for support. She should have included notice that she was also seeking to set aside the marital settlement agreement which was incorporated into the interlocutory judgment. (*In re Marriage of Stevenot* (1984) 154 Cal.App.3d 1051, 1072 [202 Cal.Rptr. 116].) In her supporting points and authorities, however, she focused on setting aside the marital settlement agreement. The court and both counsel treated the agreement as though it had been merged into the judgment and retained no independent character. (Compare *In re Marriage of Jones* (1987) 195 Cal.App.3d 1097, 1103 [241 Cal.Rptr. 231]; *In re Marriage of Adkins* (1982) 137 Cal.App.3d 68, 76-77 [186 Cal.Rptr. 818].) The issue of Wife's failure properly to notice the motion is waived by the failure of Husband to raise it in the trial court. Therefore, reference to judgment or judgments includes the marital settlement agreement.

home for Husband's medical partnership, doing the payroll, making deposits, and paying the bills.

After the couple's separation in January 1982, Wife, represented by Attorney G. Scott Gaustad, filed a petition for dissolution of marriage in action No. 45543. She discharged Gaustad in March and dismissed the action in January of 1983. During April of 1982, Husband and Wife executed a marital settlement agreement, handwritten by Husband, providing for custody of their child, support, and a division of property. (This agreement was the basis for a later agreement incorporated into the interlocutory judgment of April 11, 1983, in action No. 47523, the subject of this appeal.)

On March 30, 1983, Husband, acting in propria persona, filed a petition for dissolution of the marriage in a new action, No. 47523, alleging that all community assets and obligations had been disposed of by written agreement and requesting that custody of the minor child be awarded to Wife. Husband prepared a summons and a notice and acknowledgment of receipt of summons, as well as an appearance, stipulation, and waivers. The latter provided that the cause could be tried as an uncontested matter without notice. Without advice of counsel, Wife signed the documents on April 9, 1983. Two days later, Husband had her default entered, and an uncontested hearing that same day resulted in the court's granting an interlocutory judgment of dissolution of marriage. The court approved and incorporated into the judgment a typed property settlement agreement, which had been executed by both parties on December 22, 1982; the agreement was substantially the same as the handwritten agreement executed by the parties in April 1982. Wife did not appear at the hearing. Six months later, on October 12, 1983, the court entered the final judgment on Husband's request.

On April 6, 1984, Wife filed her motion to set aside those portions of the interlocutory and final judgments dividing the community property of the parties and providing for support. The matter was heard over a two-day period in June, and on July 16, 1984, the court filed its "Ruling on Motion," setting aside the judgment. Husband requested a statement of decision on July 25, and Wife filed a timely objection.

On August 16, 1984, the court filed its order setting aside the interlocutory and final judgments, and declining to file a statement of decision on the ground that no request for a statement was made before submission of the "one-day" case as required by Code of Civil Procedure section 632. Husband appealed from this order.

Meanwhile, Wife noticed a motion to modify support which was heard on August 31. Her motion was granted, and the court filed its order increas-

ing spousal and child support and awarding her fees and costs. Husband filed an amended notice of appeal to include this order.

## II. *Hearing on the Motion to Set Aside Judgments*

At the full, evidentiary hearing on Wife's motion to set aside the judgments, the court took judicial notice of her prior action for dissolution of the marriage. (See Evid. Code, § 452, subd. (d).)

Wife testified in her own behalf about the history of the parties' relationship as set out above and her circumstances from the time she first consulted an attorney in April 1981. In addition, she presented the testimony of two friends and of three attorneys with whom she had consulted during the course of the proceedings. She also introduced into evidence financial statements and income tax returns of the parties. We view this evidence in the light most favorable to Wife. (*In re Marriage of Gonzalez* (1976) 57 Cal.App.3d 736, 745 [129 Cal.Rptr. 566].)

Wife first consulted with Attorney Scott Gaustad in April 1981 when Husband physically abused her and she was frightened about losing custody of their child if she left. The parties separated in January 1982, and Wife moved out of the family home. Gaustad represented her that month when she filed her petition for dissolution of the marriage in action No. 45543. Gaustad had issued an order to show cause for temporary restraining and support orders, which was set for hearing a short time later. The order to show cause was not heard because the parties were talking and Wife did not want anything to happen; she told Gaustad to take no action. In either March or April of 1982, Husband became furious with Gaustad for mentioning to another attorney in a public place that he had seen bruises on Wife which had been inflicted by Husband. Husband threatened to sue Gaustad and demanded that Wife fire him, which she did.

Gaustad testified that Husband called him at home on a Saturday morning, upset and angry about the conversation over Wife's bruises, and that Wife discharged him afterwards. (A substitution of attorney was not filed, however, until July 1982.)

After discharging Gaustad, Wife signed a property settlement agreement in Husband's handwriting dated April 25, 1982. Although Gaustad was still her attorney of record, she did not consult with him before signing. At the time, Wife believed she was getting less than 50 percent of the community property. She signed the agreement because for many years Husband had told her that she had not worked for it and was not entitled to one-half of the community property. He threatened that if she did not sign, he would

declare bankruptcy and thereby avoid paying anything to her or their creditors. Husband further told Wife that his medical practice was his business and that she had nothing to do with it. "He was the one who was the doctor."

Wife admitted that she knew of all the parties' assets. She assisted Husband in preparing a financial statement in June 1981. This statement, showing total community assets of $1,306,515 and a net worth of $720,302, was admitted into evidence. Most of the assets and liabilities were acquired after the parties moved to Ukiah. Less than a year after this statement, under the April 1982 agreement, Wife received a rental residence, a 1977 Mercedes-Benz automobile, and some household furnishings, at a total net value of about $63,000. Husband received the balance of the assets, which included his medical practice, an interest in a medical building, a 30-acre ranch (with improvements including a remodeled ranch house, vineyard, and vineyard equipment), two condominiums at Lake Tahoe, his Keogh Plan, a 1977 Porsche, ranch machinery, household furnishings, miscellaneous bank accounts, and life insurance policies. He also assumed various unsecured debts of about $103,400, in addition to the secured debts on assets assigned to him. Thus Husband received community property with an approximate net value of $507,700.

Under the April 1982 agreement, Wife would receive $1,000 per month for 24 months and child support of $300 per month. Both spousal and child support would terminate if Wife cohabited with someone or remarried. Wife testified that the support provision was a compromise because Husband at first did not want to pay her anything. She said, ". . . I felt I just wanted to get enough money to get on my feet, to get a job and support myself." Husband's 1982 federal income tax return showed gross income from his medical practice was over $282,000. He testified that his net that year was $150,000.

In July 1982, Wife consulted with Attorney Susan Jordan, who filed a substitution of attorney so Gaustad was no longer attorney of record. Wife was told by Jordan that the handwritten agreement was unfair to her.

Attorney Jordan testified that Wife was in her office three or four times. Wife did not seem to hear what Jordan was saying and frequently cried. Wife was emotionally upset and incapable of asserting herself or of explaining why she would accept an unfair agreement. She expressed fears that Husband would not visit the child and that the child would be disrupted if she fought for any additional property. Jordan felt that Wife was acting under Husband's will and that she was "terrified," afraid of the power he held over the property, her life, and her daughter.

On August 3, 1982, the parties amended the handwritten agreement to increase spousal support to $1,200 a month for 45 months, but did not change the property division. Wife would not allow Jordan to discuss the marital agreement with Husband or engage in discovery proceedings because she felt that it would make him angry and make things more difficult for Wife. Jordan did telephone Husband once to suggest that the terms of the agreement needed clarification and that it should be typed; Husband was adamant that the agreement should be submitted to the court without change.

On September 2, 1982, the day before a scheduled default hearing based upon the handwritten agreement, Jordan was upset and could not sleep. She knew that Wife was not acting in her own best interest, but Wife would not allow Jordan to assist her. After worrying all night, Jordan felt that she could not go through with the hearing in good conscience and telephoned each party to that effect early on the morning of the hearing. Jordan felt this way because the properties had not been evaluated and she did not believe that the handwritten agreement was fair.

After Jordan substituted out of the case, Wife went to see Attorney Pano Stephens. Stephens testified that after his first meeting with Wife, in October 1982, Husband called him at home on a Saturday morning. Husband was talking loudly and asked Stephens what he was doing getting involved in the case. Husband told Stephens that Husband had been talking with Stephens's partner, Burgess Williams, about the divorce and that Stephens had a conflict. Thereafter, Stephens told Wife that there was enough of a suggestion of a conflict and that he could not get involved in an adversary proceeding.

Stephens testified that Wife said Husband was threatening to file bankruptcy and to have no contact with their child. Stephens told Wife that certain agreements she told him to prepare did not reflect an equal division of property and that the child and spousal support were not reasonable. Nevertheless, Stephens did have two proposed agreements typed which included the provisions of the April handwritten agreement, as modified in August, in more formal language. He also eliminated the condition providing for termination of child support if Wife cohabited with or remarried someone and included standard "boilerplate" paragraphs.

In December 1982, Husband had a typed marital settlement agreement prepared, using the format of the Stephens agreements as a model. Wife testified that when she signed this agreement on December 22, she was unrepresented by an attorney. She signed it because she was emotionally unable to continue dealing with Husband on the issue. She tried to talk to

him about the unfairness of the agreement, but he was not willing to talk about it, and he continued to threaten her. He also told her that if it was not settled soon, she would get nothing, because he was receiving credit for all the payments he was making on the properties as well as for the support payments.

The December marital settlement agreement made substantially the same division of property as had the handwritten agreement of April 1982 and the amendment of August 1982, both prepared by Husband. In January 1983, Wife dismissed action No. 45543, which is referred to in the marital settlement agreement, because she hoped the dismissal would give them more time to talk with each other about the possibility of getting back together.

People who knew Wife well during the period of her separation and dissolution testified regarding her emotional state. Jamie Deckoff, M.D., a friend of Wife's, testified that during this time Wife was emotionally unable to fight. She was frequently crying. She told Dr. Deckoff that Husband would not discuss anything with a lawyer, but would deal only with her directly. She was emotionally unable to confront Husband.

Minda Kamp, with whom Wife shared a house for about 11 months, testified that in December 1982, Wife was extremely depressed and distraught. She observed that Wife was having trouble coping with day-to-day things and was crying nearly every day. Ms. Kamp frequently witnessed Wife in tears and very upset following communication with Husband.

Testifying that he had been unrepresented by counsel in the proceedings, Husband admitted that he had had some casual conversations with a friend, Burgess Williams, who was an attorney, and that he had questioned Williams about a possible conflict of interest if Williams's partner, Pano Stephens, represented Wife. Husband also had sought the assistance of his current counsel on the mechanics of filing a dissolution action and in preparing the necessary forms.

Husband acknowledged feeling that he had contributed much more to the marriage emotionally, psychologically, and financially than Wife. He told her that she was not putting into the marriage what he was and that she was not an equal partner.

According to Husband, Wife received more than one-half of the community assets under the December 1982 agreement. In working out this allegedly equal division, Husband took credit for all the payments he made on the community obligations, including monthly mortgage payments and

taxes on the house in which he was living and other assets which he retained. He also credited himself with all support paid and to be paid in the future and payments to be made on the debts up to the time the final judgment could be entered. Husband did not assign any value to the goodwill of his medical practice because in his opinion it had no goodwill. When questioned about the seeming inequity even after his adjustments, Husband answered that in his mind another equalizing factor was that Wife had custody of their minor child.

In a written ruling, the court granted Wife's motion to set aside the judgments on the grounds of duress and extrinsic fraud or mistake. It found that the evidence, particularly the testimony of Dr. Deckoff and the three attorneys, amply supported the grounds. Another fact compelling the court's ruling was that Wife received only 10 percent to 15 percent of the community assets. The court was apparently troubled about the possibility of Husband's having had legal counsel, as it included a statement that Husband, "after consulting his attorney, the details of which did not come up in the evidence, prepared and had the decree entered."

### III. *Statement of Decision*

The hearing on the motion extended over two court days, but in total time lasted about six and one-half hours. Husband filed a written request for a statement of decision within ten days after the court announced its tentative decision, rather than making an oral request before submission as was then required by Code of Civil Procedure section 632 where the trial "has lasted less than one day . . . ."[2] ▮ He contends that the court erroneously refused to render a statement of decision, and therefore the order must be reversed.

Neither party addresses the fundamental question whether a statement of decision is required before issuance of an order on a motion for equitable relief from the judgment. Cases interpreting Code of Civil Procedure section 632 have uniformly held that a statement of decision is not required after a ruling on a motion. (*Maria P.* v. *Riles* (1987) 43 Cal.3d 1281, 1294 [240 Cal.Rptr. 872, 743 P.2d 932]; *Waller* v. *Weston* (1899) 125 Cal. 201, 204 [57 P. 892]; *Mathewson* v. *Mathewson* (1962) 207 Cal.App.2d 532, 535 [24

---

[2] In 1987 the Legislature eliminated the confusion about defining a trial that has lasted less than one day, and Code of Civil Procedure section 632 now provides in pertinent part: ". . . The request must be made within 10 days after the court announces a tentative decision unless the trial is concluded within one calendar day or in less than eight hours over more than one day in which event the request must be made prior to the submission of the matter for decision. . . ." (Stats. 1987, ch. 207, § 1, No. 2 Deering's Adv. Legis. Service, p. 662, No. 6 West's Cal. Legis. Service, p. 169.)

Cal.Rptr. 466]; 7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 371, pp. 377-378.)

The Legislature has established some exceptions to this traditional rule. For instance, a statement of decision is now required, if requested, after an order modifying or revoking a previous order for spousal support. (Civ. Code, § 4801; *In re Marriage of Davis* (1983) 141 Cal.App.3d 71, 76 [190 Cal.Rptr. 104]; see also Civ. Code, § 4600.5 [joint custody].) Another exception has been judicially created where the issue is deemed sufficiently important, that is, in child custody rulings. (*In re Marriage of S.* (1985) 171 Cal.App.3d 738, 747 [217 Cal.Rptr. 561]; see generally, 7 Witkin, Cal. Procedure, Trial, *supra,* at §§ 394-403, pp. 401-407.) We can find no case creating an exception for an order made after a motion to set aside the judgment on equitable grounds. Although a statement of decision would assist the reviewing court, we see no compelling reason for creating an exception to the traditional rule. Therefore, rather than inquire into the sufficiency of a statement of decision, our review is governed by the substantial evidence test. The trial court having found duress and extrinsic fraud or mistake, we begin with an examination of those concepts as they apply in the family law context.

### IV. *Relief Against Judgment*

Husband contends that the evidence reflected only intrinsic fraud, which under the case law is not sufficient to set aside the judgments, and that there was no evidence to support a finding of duress.[3]

*Trial Court's Discretion.* ■ Even after the time for direct attack on the judgment has elapsed, the trial court has inherent power to set aside a judgment where it " '. . . was obtained . . . through fraud, mistake, or accident, or where the defendant in the action, having a valid legal defense on the merits, was prevented in any manner from maintaining it by fraud, mistake, or accident, and there had been no negligence, laches, or other fault on his [or her] part . . . . The ground for the exercise of this jurisdiction is that there has been no fair adversary trial at law.' [Citation.]" (*Olivera* v. *Grace* (1942) 19 Cal.2d 570, 575 [122 P.2d 564, 140 A.L.R. 1328]; see 8 Witkin, Cal. Procedure (3d ed. 1985) Attack on Judgment in

---

[3] Husband also argues that Wife did not raise the issue of duress in her pleadings. Although the word "duress" was not typed onto the heading of the standard motion form, the points and authorities and Wife's declaration attached to them clearly raised the issue; and, in his opening statement, Wife's counsel stated the grounds for the motion as being "extrinsic fraud or extrinsic mistake or duress." We do not consider the pleading issue because Husband failed to raise it in the trial court. (See 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 311, p. 321.)

Trial Court, § 195, p. 594; Rest.2d Judgments, §§ 68, 70, 71.) The court may do so in an independent action in equity or, as here, in a motion in the original action. (See *Olivera, supra,* at p. 576; *Brink* v. *Brink* (1984) 155 Cal.App.3d 218, 222-223 [202 Cal.Rptr. 57].)

"Legal discretion has been defined as an impartial discretion taking into account all relevant facts, together with legal principles essential to an informed and just decision . . . ." (*In re Marriage of Jacobs* (1982) 128 Cal.App.3d 273, 280 [180 Cal.Rptr. 234]; see 9 Witkin, Cal. Procedure, Appeal, *supra,* at § 277, pp. 287-289.) In the case before us, those essential legal principles include the command to weigh competing public policies, one favoring the finality of judgments, and the other favoring a fair adversary trial on the merits.[4] The court can only exercise such inherent power "when the circumstances of the case are sufficient to overcome the strong policy favoring the finality of judgments." (*Kulchar* v. *Kulchar* (1969) 1 Cal.3d 467, 470 [82 Cal.Rptr. 489, 462 P.2d 17, 39 A.L.R.3d 1368].)

*Grounds for Relief in General.* The most common ground used to justify such equitable relief is extrinsic fraud. ■ "Fraud is extrinsic where the defrauded party was deprived of the opportunity to present his or her claim or defense to the court, that is, where he or she was kept in ignorance or in some other manner, other than from his or her own conduct, fraudulently prevented from fully participating in the proceeding." (*In re Marriage of Stevenot, supra,* 154 Cal.App.3d at p. 1068.)[5] By way of contrast, fraud is

---

[4]The rationale behind each of these two conflicting policies is detailed in the Restatement Second of Judgments: "Judgments are taken as finally determining claims because of confidence that the procedure leading to judgment is reasonably effective to ascertain the merits of the controversy. It is recognized that no system of procedure is infallible and that mistakes and miscarriages of justice may occur despite such protective devices as the right to be heard, the assistance of counsel, and the availability of appellate review. But it is assumed that modern systems of procedure generally yield results that are as just as may be expected . . . . Indeed, if this confidence did not exist, the concept of finality itself would be rationally insupportable. [¶] It is for this reason that attacks are not permitted on a judgment simply on the ground that the losing party neglected to take best advantage of his [or her] day in court . . . . Furthermore, inasmuch as losing parties have strong inducement to contrive attractive reasons why a controversy should be reopened, the rules concerning relief from a judgment are properly cast in narrow terms. On the other hand, it is equally inappropriate that all judgments be treated as absolutely inviolable. Particularly is this true when a judgment has been procured by the fraud of the successful party. To immunize such a judgment from attack is to compound the injustice of its result on the merits with the injustice of the means by which it was reached. Equally important, if judgments were wholly immune it would give powerful incentive to use of fraudulent tactics in obtaining a judgment. A litigant would know that if he [or she] could sustain duress or deception through the moment of finality, the benefit of the judgment would be his [or hers] forever." (Rest.2d Judgments, § 70, com. a, pp. 179-180.)

[5]Examples of extrinsic fraud are: "Concealment by one party of the existence of a community asset, or prevention of participation in the proceeding by the other party . . . . [¶] Failure to give notice of the action to the other party, or proceeding to obtain a judgment without the knowledge of the other party, while reconciled with him or her. [¶] Convincing the other

labeled intrinsic and not a ground for relief "if a party has been given notice of the action and has not been prevented from participating therein, that is, if he or she had the opportunity to present his or her case and to protect himself or herself from any mistake or fraud of his or her adversary, but *unreasonably* neglected to do so." (*Id.,* at p. 1069, italics added.)

While it is relatively simple to state the general principles, it is a more difficult task to determine whether the facts which have been shown constitute "extrinsic" fraud, which will justify the granting of relief, or, as urged by Husband, "intrinsic" fraud, which will not. (*In re Marriage of Brennan* (1981) 124 Cal.App.3d 598, 603 [177 Cal.Rptr. 520].) Justice King, speaking for Division Five of this District, has called this distinction "the most repetitively troublesome issue in the family law field over the last 40 years . . . ." (*In re Marriage of Stevenot, supra,* 154 Cal.App.3d at p. 1056.) And Judge Donald E. Smallwood has made a persuasive case for abolishing the extrinsic fraud rule. (See Smallwood, *Vacating Judgments in California: Time to Abolish the Extrinsic Fraud Rule* (1985) 13 Western St.U. L.Rev. 105-127 [hereafter cited as Smallwood]; see also Comment, *Seeking More Equitable Relief from Fraudulent Judgments: Abolishing the Extrinsic-Intrinsic Distinction* (1981) 12 Pacific L.J 1013.)[6] The Restatement Second of Judgments (1982) does not distinguish between extrinsic and intrinsic fraud (§ 68). The distinction has also been abandoned in rule 60(b) of the Federal Rules of Civil Procedure (28 U.S.C.), which permits a court to relieve a party from a final judgment by motion made within a reasonable time not to exceed one year for "(1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence . . . [or] (3) fraud (*whether heretofore denominated intrinsic or extrinsic*), misrepresentation, or other misconduct of an adverse party . . . ." (Italics added.) Under rule 60(b), no time limit is imposed when an independent action is based on the ground of fraud on the court.

---

party not to obtain counsel because the matter is not going to proceed. [¶] [And] [c]ompletion of the dissolution after having represented to the other party that it would not proceed without further notice." (*In re Marriage of Stevenot, supra,* 154 Cal.App.3d at p. 1069.)

[6] As an alternative to the extrinsic-intrinsic fraud test, Judge Smallwood suggests that "[t]he Court should examine the facts and circumstances in each case, measuring or testing them against the following: [¶] 1. Did the conduct, or the facts or circumstances complained of, prevent a trial of any material issue in the case or was the injured party prevented from receiving a fair adversary hearing? [¶] 2. If the conduct complained of was perjury or the introduction of false evidence in the original trial, is the proof of such fact clear and convincing, and is there a showing that the injured party was diligent and reasonable in his [or her] efforts to ascertain the truth at the original proceeding? [¶] 3. Was the injured party free from any participation in the conduct? If not, was the conduct of the injured party excusable? [¶] 4. Has the injured party delayed the bringing of action to a point where such delay constitutes a waiver or estoppel? [¶] 5. Would the result in the trial of the original action have ben [*sic*] substantially different, but for the conduct or facts and circumstances complained of? [¶] 6. Is there prejudice to the other party?" (Smallwood, *supra,* 13 Western St.U. L.Rev. at pp. 124-125, fns. omitted.)

Although California courts continue to rely primarily on the extrinsic-intrinsic fraud analysis, they have also recognized that "[e]xtrinsic fraud is a broad concept that 'tend[s] to encompass almost any set of extrinsic circumstances which deprive a party of a fair adversary hearing.' [Citation.]" (*In re Marriage of Modnick* (1983) 33 Cal.3d 897, 905 [191 Cal.Rptr. 629, 663 P.2d 187]; *Estate of Sanders* (1985) 40 Cal.3d 607, 614 [221 Cal.Rptr. 432, 710 P.2d 232]; cf. *In re Marriage of Brockman* (1987) 194 Cal.App.3d 1035, 1047 [240 Cal.Rptr. 96].) And, in some cases, "the ground of relief is not so much the fraud or other misconduct of the [other party] as it is the excusable neglect of the [moving party] to appear and present his [or her] claim or defense. If such neglect results in an unjust judgment, *without a fair adversary hearing,* the basis for equitable relief is present, and is often called 'extrinsic mistake.' [Citations.]" (8 Witkin, Cal. Procedure, Attack on Judgment in Trial Court, *supra,* at § 211, pp. 614-615.)

■ Duress has also been recognized as a ground justifying relief from a final judgment. (*Hollister Convalescent Hosp., Inc.* v. *Rico* (1975) 15 Cal.3d 660, 675 [125 Cal.Rptr. 757, 542 P.2d 1349]; *Leeper* v. *Beltrami* (1959) 53 Cal.2d 195, 205 [1 Cal.Rptr. 12, 347 P.2d 12, 77 A.L.R.2d 803]; *In re Marriage of Brockman, supra,* 194 Cal.App.3d at pp. 1045-1047; *In re Marriage of Stevenot, supra,* 154 Cal.App.3d at p. 1073, fn. 6; see Rest.2d Judgments, §§ 68, 70.) We have found no cases which state that they are granting relief from the judgment *solely* on the ground of duress, but this is probably because duress is often characterized as fraud. (See *Leeper, supra,* at p. 205 ["Duress is a species of fraud. [Citation.]"]; cf. *O'Neil* v. *Spillane* (1975) 45 Cal.App.3d 147, 158 [119 Cal.Rptr. 245] [undue influence a species of constructive fraud]; *Griffith* v. *Bank of New York* (2d Cir. 1945) 147 F.2d 899, 901-902 [160 A.L.R. 1340]; Rest.2d Judgments, § 68.)

In addition to being grounds for setting aside a final judgment, both duress and fraud are statutory grounds for attacking the validity of a contract. Civil Code section 1567 provides that an apparent consent is not "real or free" when obtained through duress, menace, fraud, undue influence, or mistake. These same grounds are relevant in determining whether consent to entry of a default judgment, such as the one under consideration here, has been voluntary. ■ Facts sufficient to set aside a contract, however, are not automatically sufficient to set aside a judgment. (*Kulchar* v. *Kulchar, supra,* 1 Cal.3d at p. 472 [mutual mistake not sufficient]; but see Rest.2d Judgments, § 71.) Each case will depend on whether the circumstances are sufficiently egregious to justify departing from the policy favoring the finality of judgments.

*Duress.* We next examine Husband's assertions on appeal in light of these general principles. ■ Husband contends that there was no evidence he

intentionally exercised duress to force Wife into an unequal agreement. We disagree.

The stringent definition of duress contained in Civil Code section 1569,[7] codifying the early common law rule, has been relaxed. (*In re Marriage of Gonzalez, supra,* 57 Cal.App.3d at pp. 743-744; *Rich & Whillock, Inc.* v. *Ashton Development, Inc.* (1984) 157 Cal.App.3d 1154, 1158-1159 [204 Cal.Rptr. 86] [economic compulsion].) ▮ Under the modern rule, " '[d]uress, which includes whatever destroys one's free agency and constrains [her] to do what is against [her] will, may be exercised by threats, importunity or any species of mental coercion [citation] . . . .' " (*Gonzalez, supra,* at p. 744.) It is shown where a party "intentionally used threats or pressure to induce action or nonaction to the other party's detriment. [Citing *Gonzalez.*]" (*In re Marriage of Stevenot, supra,* 154 Cal.App.3d at p. 1073, fn. 6; see Rest.2d Contracts (1981) §§ 175, 176.)[8] The coercion must induce the assent of the coerced party, who has no reasonable alternative to succumbing. (*Rich & Whillock Inc.* v. *Ashton Development, Inc., supra,* 157 Cal. App.3d at pp. 1158-1159.)

To determine whether a contract (or a default judgment) was the product of duress, the courts look not so much to the nature of the threats, but to their effect on the state of the threatened person's mind. (*In re Marriage of Gonzalez, supra,* 57 Cal.App.3d at p. 744; Rest.2d Contracts, § 175, com. c.) This the trial court did. In its ruling, it cited as particularly persuasive the "overwhelming" testimony of Dr. Deckoff, and of Attorneys Gaustad, Stephens, and Jordan, to the effect that Wife was "very emotional, upset and distraught to the point that . . . she was acting under her husband's

---

[7] Civil Code section 1569, unchanged since its enactment in 1872, provides: "Duress consists in: [¶] 1. Unlawful confinement of the person of the party, or of the husband or wife of such party, or of an ancestor, descendant, or adopted child of such party, husband, or wife; [¶] 2. Unlawful detention of the property of any such person; or, [¶] 3. Confinement of such person, lawful in form, but fraudulently obtained, or fraudulently made unjustly harassing or oppressive."

[8] The Restatement Second of Contracts, section 175 (When Duress by Threat Makes a Contract Voidable), provides in part: "(1) If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim. . . ."

The Restatement Second of Contracts, section 176, states: "(1) A threat is improper if [¶] (a) what is threatened is a crime or a tort, or the threat itself would be a crime or a tort if it resulted in obtaining property, [¶] (b) what is threatened is a criminal prosecution, [¶] (c) what is threatened is the use of civil process and the threat is made in bad faith, or [¶] (d) the threat is a breach of the duty of good faith and fair dealing under a contract with the recipient. [¶] (2) A threat is improper if the resulting exchange is not on fair terms, and [¶] (a) the threatened act would harm the recipient and would not significantly benefit the party making the threat, [¶] (b) the effectiveness of the threat in inducing the manifestation of assent is significantly increased by prior unfair dealing by the party making the threat, or [¶] (c) what is threatened is otherwise a use of power for illegitimate ends."

will." ▪ ▪▪▪ ▪ To show lack of consent, it was unnecessary to establish that she lacked the capacity to contract, only that she was in such a mentally weakened condition due to anxiety and emotional anguish or exhaustion that she was unable to protect herself against Husband's demands. (*O'Neil* v. *Spillane, supra,* 45 Cal.App.3d at p. 155; *Smalley* v. *Baker* (1968) 262 Cal.App.2d 824, 834-835 [69 Cal.Rptr. 521].)[9]

The testimony here graphically portrays an emotionally distraught wife who is unable to deal with her spouse on an arms-length basis and who is so intimidated by him that she is unable to take advantage of legal advice. It further reveals that her concerns about confronting Husband were well-founded. He actively interfered with her obtaining legal assistance and conducted himself in a manner calculated to deprive Wife of representation by counsel. He told Wife that he would not discuss anything with a lawyer, but would only deal with her directly. Ultimately, when Wife signed the agreement from which the trial court granted her relief, she was not represented by counsel. Nor was she represented when she signed the earlier handwritten agreement and the documents required for the default hearing.

Lack of independent advice, standing alone, is not sufficient to support a finding that Wife's consent was obtained through coercion. (*Smith* v. *Lombard* (1927) 201 Cal. 518, 524 [258 P. 55] [undue influence]; *Marsiglia* v. *Marsiglia* (1947) 78 Cal.App.2d 701, 705 [178 P.2d 478] [undue influence].) But, it "'. . . is a fact to be weighed by the trial court in determining whether [that party] acted voluntarily and with a complete understanding of the transaction. [Citations.]'" (*Roeder* v. *Roeder* (1953) 118 Cal.App.2d 572, 581 [258 P.2d 581].) Here, the evidence shows Husband's active interference with Wife's attempts to obtain legal assistance. Under the circumstances of this case, lack of independent advice is persuasive evidence in support of the court's ruling.

Lack of independent advice is not the only indicia of duress present here. Perhaps the most significant mark is Wife's consent to a grossly unfair agreement by which she received only 10 to 15 percent of the community property and inadequate support for herself and the minor child. (See Rest.2d Contracts, § 208 [unconscionable contracts].) The evidence reveals no consideration for such an unequal agreement in the way of economic or psychological benefit to Wife or the child. Husband's assurance to Wife that

---

[9] Although the trial court's findings were of duress and extrinsic fraud or mistake, the record also demonstrates undue influence, that is, "persuasion which tends to be coercive in nature, persuasion which overcomes the will without convincing the judgment. [Citation.]" (*Odorizzi* v. *Bloomfield School Dist.* (1966) 246 Cal.App.2d 123, 130 [54 Cal.Rptr. 533].) Undue influence is marked by a high pressure which works on the other party's weakness and which approaches coercion. (*Ibid.*; see Rest.2d Contracts, § 177.)

his taking the bulk of the assets would save her the burden of debt financing has a hollow ring. He failed to consider that liquidation of assets or an adequate support award would have reduced or eliminated any such burden.

Husband made threats and misrepresentations. He threatened Wife with bankruptcy and urged her immediate action to prevent dissipation of her share of the property through credits to him of all payments for debts and support. He represented that she had no interest in his medical practice, telling her that she had not worked for it and that she was not an equal partner in the marriage. He aimed at her most vulnerable spot when he threatened not to see their child.

Husband argues that his claim to credits was an accurate statement of the law. His claim is only partly sustainable. Our Supreme Court in *In re Marriage of Epstein* (1979) 24 Cal.3d 76, 80 [154 Cal.Rptr. 413, 592 P.2d 1165], held that a spouse may claim reimbursement for amounts paid after separation on preexisting community debts. But the court also recognized that reimbursement would be inappropriate where the payment was made on a debt incurred for the acquisition or preservation of an asset the spouse was using and the amount paid was not substantially in excess of the value of the use, or where the payment constituted a discharge of the spouse's duty to pay child or spousal support. (*Id.,* at pp. 84-85; *In re Marriage of Reilley* (1987) 196 Cal.App.3d 1119, 1123 [242 Cal.Rptr. 302].) Here, Husband had possession and use of most of the community assets, and his right to reimbursement was uncertain even if he could establish that payments were made from his separate income rather than community accounts payable and were in excess of the value of the use of the various assets. Absent agreement, he was not entitled to credits for support payments. And it is possible that he might be required to reimburse the community for his use of the assets. (*In re Marriage of Watts* (1985) 171 Cal.App.3d 366, 374 [217 Cal.Rptr. 301].)

Upon dissolution of the marriage, the community property must be divided equally between the spouses, absent a contrary agreement. (Civ. Code, § 4800; *In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 748 [131 Cal.Rptr. 873, 552 P.2d 1169].) Husband's medical practice, including goodwill, was a community asset; his representations were false. (*In re Marriage of Watts, supra,* 171 Cal.App.3d at p. 372.) His statement that Wife had no interest in his medical practice was not mere opinion on character or value. Rather, it was couched in terms to reinforce her feeling of inadequacy and lack of equality.

After Wife's hope for reconciliation disappeared, she reasonably believed that she had no alternative to compliance with Husband's demands and that

her only recourse was to salvage the assets assigned to her and to use the meager support to develop her self-sufficiency.

It is seldom possible to show intent by direct evidence; usually it must be shown by the totality of the circumstances. From the evidence we have set out, the court could infer that Husband intentionally used coercion to induce Wife's consent to an unconscionable contract and a default judgment dissolving the marriage. (*In re Cheryl E.* (1984) 161 Cal.App.3d 587, 601 [207 Cal.Rptr. 728]; *Estate of Hannam* (1951) 106 Cal.App.2d 782, 786 [236 P.2d 208].)

In summary, the evidence shows that Wife's consent to the agreement and entry of a default judgment was procured by duress practiced on her by Husband and that his acts were intentional. She was effectively deprived of independent counsel; she was in a distraught and weakened condition emotionally and unable to confront Husband; he undermined her psychologically by repeatedly telling her she had not contributed as much as he to the marriage and was not an equal partner; he made threats and misrepresentations and pressured her into taking immediate action; she agreed to an unconscionable contract; and she had no reasonable alternative. Thus, through the "extrinsic" factor of duress, she was denied a fair adversary hearing.

*Extrinsic Fraud.* ▉▉▉ Husband also claims that the evidence did not support a finding of extrinsic fraud on his part because he concealed no assets and was entitled to express opinions on the character and value of the property. We disagree with his conclusion. We think that his course of conduct fits the pattern of constructive fraud—external to the court hearing.

Civil Code section 1573 provides in part that constructive fraud consists "[i]n any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, . . . by misleading another to his [or her] prejudice . . . ." (Civ. Code, § 1573, subd. 1.) "Fraud assumes so many shapes that courts and authors have ever been cautious in attempting to define it. Each case must be considered on its own facts. [Citation.] ▉▉▉ In its generic sense, constructive fraud comprises all acts, omissions and concealments involving a breach of legal or equitable duty, trust, or confidence, and resulting in damage to another. [Citations.] Constructive fraud exists in cases in which conduct, although not actually fraudulent, ought to be so treated—that is, in which such conduct is a constructive or quasi fraud, having all the actual consequences and all the legal effects of actual fraud. [Citations.]" (*Estate of Arbuckle* (1950) 98 Cal.App.2d 562, 568 [220 P.2d 950, 23 A.L.R.2d 372].) It usually "arises

from a breach of duty where a relation of trust and confidence exists. [Citations.]" (*Id.,* at pp. 568-569.)

 The existence of a confidential relationship is generally based on trust and confidence and is a question of fact. (See 7 Witkin, Summary of Cal. Law (8th ed. 1974) Wills and Probate, § 111, p. 5626.) The Legislature, however, has established a statutory presumption that in transactions between themselves, husband and wife occupy a confidential relationship with each other. (Civ. Code, § 5103; *Estate of Cover* (1922) 188 Cal. 133, 143 [204 P. 583].) The parties may, of course, elect to deal with each other at arm's length, and when they do so the obligations otherwise imposed by the confidential relationship are terminated. (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 600 [153 Cal.Rptr. 423, 591 P.2d 911].) But, the spouse claiming that the parties no longer stand in a confidential relationship has the burden of proving that the statutory presumption has been overcome, and that the parties are dealing at arm's length. (Evid. Code, §§ 605, 606.)

The duties imposed by the confidential relationship were delineated in *Cover,* where the parties had *not* separated when the breach of duty occurred.[10] We summarize that holding, with which we agree, making it applicable to both spouses. The marriage relationship alone will not support a presumption of undue influence by one spouse over the other where the transaction between them is shown to be fair. But, where one spouse admittedly secures an advantage over the other, the confidential relationship will bring into operation a presumption of the use and abuse of that relationship by the spouse obtaining the advantage. Each party is bound in transactions with the other to the highest and best of good faith and is obligated not to obtain and retain any advantage over the other resulting from concealment or undue pressure. To avoid the presumption of undue influence emanating from the procurement of any advantage over the other spouse, a spouse must make full and fair disclosure of all that the other spouse should know for his or her benefit and protection concerning the nature and effect of the transaction, or else must deal with the other spouse at arm's length, giving him or her the opportunity of independent advice. (*Estate of Cover, supra,* 188 Cal. at p. 144.)

(14) Nevertheless, our Supreme Court has held that *after separation,* each party can take a position adverse to the other party on the character-

---

[10] In *Cover,* the husband had a large estate consisting solely of his separate property. Without advising his wife about the extent of his holdings, he had her sign a postmarital agreement waiving all interest in his estate in exchange for a relatively small amount of property. After his death, she was appointed administratrix of his estate, and a son of the deceased petitioned to have her letters of administration revoked on the basis of her waiver. The Supreme Court affirmed denial of his petition, finding that the evidence supported the finding that the agreement was invalid because procured through constructive fraud on the wife. (*Estate of Cover, supra,* 188 Cal. at pp. 141-143.)

ization and valuation of property, and the other party must investigate the facts. (*In re Marriage of Connolly, supra,* 23 Cal.3d at p. 600; *Boeseke* v. *Boeseke* (1974) 10 Cal.3d 844, 849-850 [112 Cal.Rptr. 401, 519 P.2d 161]; *Collins* v. *Collins* (1957) 48 Cal.2d 325, 330-331 [309 P.2d 420]; *Jorgensen* v. *Jorgensen* (1948) 32 Cal.2d 13, 23 [193 P.2d 728].) These cases are distinguishable from the one before us.

 First, Husband's threats and misrepresentations here went beyond mere opinions on the value and character of assets. Through psychological coercion, Husband convinced Wife she was not entitled to an equal share of the property or any share of his practice. Although she thought the agreement was unfair, she had no legal expertise with which to challenge his position. Husband asserted that his entitlement to credits against her share of the property would eliminate her share if she prolonged the action. She had no basis for disbelieving him and was induced by his misleading statements to sign an unfair agreement.

Second, in each of the above cases the complaining spouse was represented by counsel, was dealing at arm's length, and had full opportunity to investigate the validity of the other party's representations. In short, the confidential relationship had terminated, and the wife did not reasonably rely on her husband's representations. (*In re Marriage of Connolly, supra,* 23 Cal.3d at pp. 600-601; *Hensley* v. *Hensley* (1918) 179 Cal. 284, 287-288 [183 P. 445]; see Smallwood, *supra,* 13 Western St.U. L.Rev. at pp. 114-115.) We do not think the duty of independent investigation arises where the complaining spouse is repeatedly thwarted in obtaining independent advice by the intentional acts of the other party. (*Estate of Cover, supra,* 188 Cal. at p. 144.)

Furthermore, the evidence that the parties were not dealing at arm's length was overwhelming and supports the court's implied finding that the statutory presumption of a confidential relationship was applicable. Husband's evidence that the agreement was fair and that Wife had independent advice was unconvincing. Although Husband and Wife had physically separated, his psychological, emotional, and financial control over her continued. Under these circumstances, the obligations imposed by the confidential relationship, including the duty of good faith, were not terminated. It is irrelevant whether Husband intentionally or negligently made the representations. His conduct constitutes constructive fraud. (Civ. Code, § 1573; *O'Neil* v. *Spillane, supra,* 45 Cal.App.3d at p. 158; *Estate of Arbuckle, supra,* 98 Cal.App.2d at p. 568.)

We think this conclusion is reinforced by the Legislature's 1986 amendment of subdivision (e) of Civil Code section 5125. (Stats. 1986, ch. 1091,

§ 1, p. 3815, operative July 1, 1987.) First, a review of the historical background is helpful.

Before 1975, the husband had the management and control of the community property. (See Civ. Code, §§ 5125, 5127.) Because the husband had such power over his wife's one-half interest, by case law he was held to the duties of a trustee or fiduciary, irrespective of any confidential relationship. (*Vai v. Bank of America* (1961) 56 Cal.2d 329, 337 [15 Cal.Rptr. 71, 364 P.2d 247].) His fiduciary duties, in contrast with the duties imposed by the confidential relationship, continued as to property remaining under his control until the property was divided by agreement or by a court. (*Ibid.*)

In 1973, the Legislature amended Civil Code sections 5125 and 5127, effective January 1, 1975, giving spouses equal management and control of the community property. (Stats. 1973, ch. 987, §§ 14, 15, pp. 1901-1902.) In 1974, the Legislature added subdivision (e) to Civil Code section 5125, also effective January 1, 1975, which for the first time mandated that "[e]ach spouse shall act in good faith with respect to the other spouse in the management and control of the community property." (Stats. 1974, ch. 1206, § 4, pp. 2609-2610.) The Legislature did not specify whether the obligation to act in good faith terminated on separation of the spouses or how it related to Civil Code section 5103 providing that the parties are in a confidential relationship.

In 1984, this addition of subdivision (e) was interpreted in *In re Marriage of Stevenot, supra,* 154 Cal.App.3d at page 1068, as changing the fiduciary duty (established by case law) to one of good faith, which was a lesser duty. The court held that the confidential relationship terminated upon separation or the filing of the petition for dissolution, whichever occurs first, and thereafter the "duty to deal with the other in good faith . . . requires the disclosure of all community assets, but not their valuation unless the valuation or factors affecting the valuation are peculiarly within the knowledge of one spouse, and reasonable inquiry and use of discovery proceedings by the other spouse would fail to disclose them." (*Id.,* at p. 1070.)

In 1986, the Legislature apparently rejected the *Stevenot* court's limitations on the confidential relationship when it amended subdivision (e) to mandate that "[e]ach spouse shall act in good faith with respect to the other spouse in the management and control of the community property in accordance with the general rules which control the actions of persons having relationships of personal confidence as specified in Section 5103, *until such time as the property has been divided by the parties or by a court.* This duty *includes* the obligation to make full disclosure to the other spouse of the

existence of assets in which the community has an interest and debts for which the community may be liable, upon request. The case law defining the standard of care applicable to Section 5103, but not the case law applicable to [trustees under the Prob. Code], applies to this section.[11] *In no event shall this standard be interpreted to be less than that of good faith in confidential relations . . . .*" (Stats. 1986, ch. 1091, § 1, p. 3815, operative July 1, 1987, italics added.)

■■■■ In an uncodified section of the act, the Legislature expressed its intent "to set a standard with regard to the financial and property rights of the marriage which would promote an equal marital partnership protecting the rights and establishing the responsibilities of both parties equally." (Stats. 1986, ch. 1091, § 3, subd. (b), pp. 3816-3817.)[12]

The Legislature added remedies for breach of the duty of good faith in Civil Code section 5125.1, specifically making it nonretroactive, with certain exceptions. Otherwise, the uncodified, express intent of the Legislature was "to clarify and enhance the duties owed by one spouse to another in managing community property," *but not to affect adversely the rights of any party under existing law other than a spouse.* (Stats. 1986, ch. 1091, § 3, subd. (a), p. 3816.) ■■ Although we conclude that the amendments to subdivision (e) of section 5125 are retroactive, we find it unnecessary to base our decision in this case on that section.

*Other Equitable Considerations.* ■■ Husband argues that Wife should have been denied relief because of laches. ■■ "[T]he affirmative defense of laches requires unreasonable delay in bringing suit 'plus either acquiescence in the act about which [the moving party] complains or prejudice to [the other party] resulting from the delay.' [Citation.]" (*Miller v. Eisenhower Medical Center* (1980) 27 Cal.3d 614, 624 [166 Cal.Rptr. 826,

---

[11] The legislative directive to apply the case law applicable to the confidential relationship engenders some confusion. For example, compare *Vai* v. *Bank of America, supra,* 56 Cal.2d 329, with *Jorgensen* v. *Jorgensen, supra,* 32 Cal.2d 13, and *In re Marriage of Connolly, supra,* 23 Cal.3d 590.

[12] In interpreting this new standard, we suggest that consideration be given to the meaning of good faith. Black's Law Dictionary defines "[g]ood faith" as ". . . an intangible and abstract quality with no technical meaning . . . encompass[ing], among other things, an honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage . . . . Honesty of intention . . . ." (Black's Law Dict. (5th ed. 1979) p. 623.) Webster's definition is similar: "a state of mind indicating honesty and lawfulness of purpose: belief in one's legal title or right: belief that one's conduct is not unconscionable . . . : absence of fraud, deceit, collusion, or gross negligence . . . ." (Webster's New Internat. Dict. (3d ed. 1970) p. 978.)

614 P.2d 258].) Husband offered evidence of Wife's acquiescence to the marital settlement agreement, but that, of course, was the very issue to be resolved in Wife's motion. He offered no evidence of prejudice to himself caused by her delay in seeking relief. In fact, he raised the issue of laches for the first time in his posthearing trial brief.

Laches, strictly speaking, is not an appropriate doctrine, because it shifts to the opposing party the burden of proving that the complaining party has unreasonably delayed in seeking relief. (*Weitz* v. *Yankosky* (1966) 63 Cal.2d 849, 856-857 [48 Cal.Rptr. 620, 409 P.2d 700]; see 7 Witkin, Summary of Cal. Law, Equity, *supra,* § 15, p. 5240.) The opposing party is not required to prove the affirmative defense of laches. ■ Rather, a party seeking relief from a judgment has the burden of showing reasonable diligence in discovering the grounds for relief and, after discovery, in seeking relief. (*Weitz, supra,* at p. 857; see Rest.2d Judgments, § 73.)

"In determining whether reasonable diligence has been exercised the court will consider the same factors as are considered in determining whether [the judgment] was secured by excusable extrinsic mistake [fraud, or duress] . . . ." (*McCreadie* v. *Arques* (1967) 248 Cal.App.2d 39, 46 [56 Cal.Rptr. 188]; *In re Marriage of Wipson* (1980) 113 Cal.App.3d 136, 144 [169 Cal.Rptr. 664].) Lack of prejudice is one of the factors that the trial court may properly consider in determining whether the moving party has acted diligently. "[T]he greater the prejudice, the more timely must be the relief sought." (*McCreadie, supra,* at p. 47.)

In this case, the interlocutory judgment was entered on April 11, 1983, and the final judgment was entered on October 12, 1983. Wife moved to set them aside on April 6, 1984, and her motion was granted in July 1984.

When Wife left in January 1982, she took $6,000 from a savings account, but gave $4,800 back to Husband because he said he needed it to pay taxes. She had a checking account with approximately $600 in it, plus the $1,300 monthly support Husband was paying. The court could infer that, contrasted with her former standard of living, she was economically insecure. More importantly, five witnesses attested to her fragile emotional condition and her inability to confront Husband. Wife testified that it took her a long time to realize that she had been a full partner in the marriage. At the time of the hearing, Wife was living with the minor child in San Francisco and attending college, financed by the sale of the 1977 Mercedes-Benz assigned to her. ■ This evidence is sufficient to support the trial court's implied findings that one year was not an unduly long time for Wife to regain her emotional stability and that she was reasonably diligent in asserting her claim.

*Policy Favoring Finality of Judgments.* ■ The trial court here struck a proper balance between the policy favoring a trial on the merits and that favoring the finality of judgments. The evidence that Husband coerced Wife's consent to an unfair agreement and default judgment is compelling. A court applying equitable principles should not compound the miscarriage of justice by immunizing such a judgment from attack. That is not to say that every instance of pressure on a spouse should establish grounds for later attack on a judgment. It is not unusual in marital contract negotiations to find pressure exerted by one or both spouses and uninformed opinions on the law asserted as fact. But, unless the circumstances of the case are egregious, as they are here, the policy favoring finality should prevail.

■ The policy favoring finality is mandated primarily by the need for confidence in the judicial system. (See fn. 4, *ante.*) Judicial economy is, of course, another important factor for our overburdened courts. The average default hearing, however, usually takes less than 10 minutes. At such a hearing the court seldom has sufficient data to determine whether the agreement is fair to the nonappearing spouse, and thus judicial approval of a submitted agreement is often perfunctory. Where little judicial time and effort have been expended, " '. . . the factor of judicial economy which otherwise weighs in favor of finality is less strong, and the equitable considerations of fair hearing and of penalizing fraud weigh more compellingly.' [Citation.]" (*In re Marriage of Brennan, supra,* 124 Cal.App.3d at pp. 604-605; *Los Angeles Airways, Inc.* v. *Hughes Tool Co.* (1979) 95 Cal.App.3d 1, 7 [156 Cal.Rptr. 805]; see Rest.2d Judgments, § 68, com. c.)[13]

*Conclusion.* ■ "In assessing the sufficiency of evidence on appeal, we must view the evidence in the light most favorable to the trial court's determination, drawing all reasonable inferences and disregarding all contradictory evidence. [Citation.]" (*In re Marriage of Adkins, supra,* 137 Cal.App.3d at p. 75; *Shamblin* v. *Brattain* (1988) 44 Cal.3d 474, 479 [243 Cal.Rptr. 902, 749 P.2d 339].) From our review of the record, we find that the evidence is sufficient to support the trial court's express finding that Wife was prevented by fraud, mistake, and duress from having a fair adversary hearing and its implied finding that Wife's delay in seeking relief was reasonable. We also think that the court's implied finding that the circumstances of this case were sufficient to overcome the strong policy favoring finality of judgments was amply supported by the evidence.

---

[13] The Legislature has expressly provided that even though parties to judgments of summary dissolution of marriage waive their rights to appeal or move for new trial (Civ. Code, § 4550, subd. (j)), these judgments may be set aside under Code of Civil Procedure section 473, or for fraud, duress, accident, or mistake, or other grounds recognized in law or equity. (Civ. Code, § 4555.) This demonstrates a public policy in favor of vacating improper judgments, even though they are final, where these grounds exist and little or no judicial time was invested in the trial.

## V. *Order for Support and Attorney Fees*

Wife's motion to set aside the judgments was heard in June 1984, and the order granting her motion was filed on August 16. Husband filed his notice of appeal on August 31. In the interim, on August 1, Wife filed a motion for modification of child and spousal support and attorney fees, which was set for hearing on August 31. Husband did not file a financial declaration or any written opposition to the motion. Nor was he present at the hearing. According to the court's minutes, his counsel appeared and argued against the motion, but Husband has not provided us with a record of this hearing. Having no contrary evidence, and considering the assets involved (at the prior hearing), the court on September 4 made its ruling ordering Husband to pay the increased sums requested in Wife's motion. Husband filed an amended notice of appeal to include the order modifying support and awarding attorney fees.

Husband now argues (1) that spousal support was nonmodifiable under the marital settlement agreement, which provided for survival of the agreement even though it was incorporated into an interlocutory judgment, and (2) that under Code of Civil Procedure section 916, his first notice of appeal stayed any action by the trial court, and it was without jurisdiction to make a support order.

*Nonmodifiability.* ■ Husband did not raise this issue in the trial court. " 'It is elementary that questions not raised in the trial court will not be considered on appeal. [Citations.] . . .' " (*Dunn v. Dunn* (1960) 180 Cal.App.2d 839, 842 [4 Cal.Rptr. 748]; 9 Witkin, Cal. Procedure, Appeal, *supra,* § 311, p. 321.) Husband does not claim to come within the exceptions to this basic rule, i.e., that a reviewing court will consider noncurable defects such as lack of jurisdiction or matters involving the public interest or the administration of justice even though the issue is raised for the first time on appeal. (9 Witkin, *supra,* at § 315, pp. 326-327.) We therefore do not consider his contention.

*Modification of Support Pending Appeal.* Wife, having succeeded in her motion to set aside the judgments, could not then enforce the support provided for in those very same judgments. Thus, pending Husband's appeal (and any subsequent trial on the various issues, including permanent spousal support), Wife would not have the benefit of a support order.

However, Civil Code section 4357 provides that during the pendency of any dissolution proceeding, the court may order either spouse to pay any amount necessary for the support and maintenance of the other spouse and the minor children. ■ "An order for temporary support pending liti-

gation is independent of any alimony award in the main action, and the power of the court to make such an award continues during the pendency of any appeal. [Citations.]" (*Bain* v. *Superior Court* (1974) 36 Cal. App.3d 804, 807-808 [111 Cal.Rptr. 848]; see also *In re Marriage of Horowitz* (1984) 159 Cal.App.3d 377, 379, 380-385 [205 Cal.Rptr. 880].) And the right to temporary support does not depend upon the issues being appealed. (*Bain, supra*, at p. 809.)

An order for child support is deemed law-imposed, even where there is an agreement between the parties, and it may be modified or revoked at any time in the court's discretion. (Civ. Code, § 4811, subd. (a).)

Although Wife labeled her motion as one for "modification" of support, the court had jurisdiction to order temporary child and spousal support, regardless of the label. (Civ. Code, § 4357.) Furthermore, Civil Code section 4370 allows an award of attorney fees, in the court's discretion, "as may be reasonably necessary to maintain or defend any subsequent proceeding . . . ." The trial court did not err.

## VI. *Disposition*

We find no abuse of discretion. The order setting aside the interlocutory and final judgments, including the marital settlement agreement, is affirmed. The order for temporary spousal support, child support, and attorney fees is affirmed. Husband shall pay Wife's costs on appeal.

White, P. J., and Merrill, J., concurred.