Filed 7/21/21  Marriage of Gurvitz CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re Marriage of JENNIFER and JOSEPH GURVITZ. | B300198 |
| JENNIFER GURVITZ,<br><br>    Respondent,<br><br>        v.<br><br>JOSEPH GURVITZ,<br><br>    Appellant. | (Los Angeles County Super. Ct. No. BD617345) |

APPEAL from an order of the Superior Court of Los Angeles County, Lynn Healey Scaduto, Judge.  Reversed and remanded with directions.

Holstrom, Block & Parke, Ronald B. Funk for Appellant.

Ribet & Silver, Claudia Ribet for Respondent.

—————————————

# INTRODUCTION

Joseph Gurvitz appeals a family court order denying his motion to set aside a settlement agreement and a stipulated judgment entered in his marriage dissolution case. Joseph[1] contends the family court prejudicially erred by declining to hold an evidentiary hearing on his motion. We agree and reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

Jennifer and Joseph married in February 2003 and separated in March 2015. They have three children together: 16-year-old Aliza, 15-year-old Charles, and 11-year-old David.

A.  *The Dissolution Petition, Jennifer's Request for Support Orders, and the Civil Cases*

Joseph was arrested on March 13, 2015 for domestic violence against Jennifer earlier that day. Jennifer petitioned for dissolution of the marriage on March 16, 2015. On October 16, 2015, Joseph pleaded no contest to one count of misdemeanor spousal battery in violation of Penal Code section 243, subdivision (e)(1), and one count of misdemeanor contempt of court for violating a protective order in violation of Penal Code section 166, subdivision (c)(1). At the plea hearing the court issued a criminal domestic violence restraining order with an August 20, 2018 expiration date.

On March 1, 2016 the family court issued a civil domestic violence restraining order that also had an August 20, 2018 expiration date. The family court's order stated that the criminal domestic violence restraining order remained in effect.

---

[1]  For clarity we refer to the parties and other case participants by their first names.

2

On April 1, 2016 Jennifer filed a request for orders requiring Joseph to pay child and spousal support. Jennifer alleged Joseph held considerable assets in foreign bank accounts, and that he had transferred and hidden these assets when Jennifer filed for dissolution. Jennifer also alleged she had learned through discovery that Joseph had borrowed $2 million from East West Bank in August 2011 secured by the family's Los Angeles home (the June Street residence).

A forensic accountant retained by Jennifer submitted a declaration stating that between August 30, 2013 and February 28, 2015 a total of $590,599 had been deposited into one of the couple's bank accounts via wire transfers from Joseph's father, Meir Gurvitz, and that the couple had used those funds to pay household expenses. The couple's other bank accounts had significant balances in 2011, 2013 and 2015, but the accountant could not trace the source or use of the funds. The accountant identified several foreign accounts he could not assess because Joseph had not provided the requisite authorizations. One of Joseph's accounts with First International Bank of Israel had a balance of more than $1 million in March 2015, but held only $168 three months later. Joseph did not provide the accountant with his tax returns.

Joseph asserted the couple had a "negative estate," and that Joseph had been borrowing money from Meir to pay his living expenses. Joseph alleged his family had lived beyond its means during the marriage due to Meir's generosity, but that Meir had informed Joseph his generosity had "permanently ended." Joseph stated he had been unemployed since 2014, and had been unable to secure a job or permanent housing.

Joseph claimed that a residence in Savyon, Israel (the Savyon residence) was in his name pursuant to an irrevocable gift from Meir, but that Joseph held only a 20 percent interest in the property. Joseph asserted that a mortgage on the Savyon residence exceeded the value of his interest in the property.

Joseph stated the June Street residence was purchased in 2010 as an investment property in Joseph's name with Meir's financial assistance through Meir's company Freshbrook Ltd.[2] According to Joseph, Jennifer quitclaimed any interest in the property upon its purchase. A deed of trust reflecting a $2.6 million loan was placed on the property in Freshbrook's name. In 2012 Joseph refinanced the property through a new loan from Freshbrook. Joseph claimed the mortgage and deed of trust on the June Street residence rendered the property without equity.

During the dissolution proceedings, Freshbrook filed a civil lawsuit against Jennifer and Joseph seeking to enforce its alleged loan agreement with Joseph and the deed of trust on the June Street residence. Jennifer filed a cross-complaint seeking cancellation of Freshbrook's deed of trust and cancellation of an abstract of judgment and confession of judgment Joseph executed during the dissolution proceedings in a second lawsuit regarding the property.

On March 24, 2016 the superior court deemed the civil lawsuits related to the dissolution action. On April 29, 2016 Jennifer moved to join Meir and Freshbrook as parties to the dissolution action. On July 5, 2016 the family court granted

---

[2]     Freshbrook is a British Virgin Islands limited liability company formed in 2001.

Jennifer's motion and ordered Meir and Freshbrook joined as indispensable parties to the dissolution action.

B. *The Family Court's Temporary Support Orders*

On July 11, 2016, following a three-day evidentiary hearing, the family court[3] ordered Joseph to pay Jennifer $1,602 per month in temporary child support and $827 per month in temporary spousal support.[4] The court calculated the sums to be paid based primarily on $2,500 in monthly income Joseph received from Meir for Joseph's living expenses. The court rejected Jennifer's contention that Joseph earned $47,000 to $50,000 per month, finding that "[t]he evidence showed more persuasively that it was in fact Meir who was acting behind the scenes to move the money in and out of the accounts in Joseph's name—for whatever reason—but not Joseph himself earning the money." The court further observed that, although Joseph stated that funds he received from Freshbrook during the marriage were loans Meir intended Joseph to repay, Joseph did not provide documents evidencing any loans.

C. *The Settlement*

On or about September 12, 2017 Jennifer, Joseph, Meir and Freshbrook executed a settlement agreement resolving the dissolution and civil actions. Each party had counsel in the settlement negotiations. The agreement provided that its terms

---

[3] Judge Michael Convey.

[4] The court also ordered Joseph to pay additional child support of one-half the amount of the children's unreimbursed health care costs.

5

would be memorialized in a stipulated judgment to be entered in the dissolution case.

The settlement awarded Jennifer the June Street residence as her sole and separate property, free and clear of all encumbrances on title due to Freshbrook's liens, but subject to East West Bank's $2 million mortgage. The parties agreed to dismiss their civil actions and cross-actions regarding the June Street residence. The settlement required Jennifer to sell the residence as soon as practicable after March 31, 2018, with Jennifer bearing all sales costs, property maintenance costs, mortgage payments, and taxes and insurance costs before the sale. Jennifer would receive the net proceeds from the sale as her sole and separate property, except $675,000 as an "equalizing payment" to Joseph. Of that amount, $75,000 would be paid directly from escrow to Jennifer as payment for Joseph's support arrears from the July 11, 2016 support orders through August 1, 2017. The remaining $600,000 would be deposited into an account to pay Joseph's future child support obligations. Joseph was awarded all right, title and interest in the Savyon residence.

Joseph agreed to grant Jennifer an unconditional "Get"—a Jewish dissolution document—and sole legal and physical custody of the children. Jennifer agreed to request that the court dismiss the civil domestic violence restraining order against Joseph, and to cooperate with Joseph as necessary to seek dissolution of the order.

The settlement also included mutual waivers of spousal support, terms related to the children's medical and school expenses, and an agreement that each party would bear his or her attorneys' fees and costs. Jennifer and Joseph would mutually select an independent child custody expert to assist in

creating a visitation plan for the children. The parties also agreed to waive and release all claims against one another, known and unknown, including "all claims and counterclaims in the pending civil matters and all claims for breach of fiduciary duty, violation of ATROS [Automatic Temporary Restraining Orders], and spousal support arrearages in the family law matter."

The parties represented that they were executing the agreement "freely and voluntarily and have had sufficient time to consider all terms and conditions and to confer with their attorneys throughout the negotiation process." Each party further "represent[ed] and warrant[ed] that at the time of signing this Deal Memo, she or he is not suffering from any mental or emotional condition which is severe enough to interfere with her or his ability to read, understand, and freely agree to the terms of this Deal Memo."

D.    *The Hearing on and Entry of the Stipulated Judgment*

The parties submitted the proposed stipulated judgment contemplated by the settlement agreement to the family court on January 10, 2018.[5]

The family court[6] scheduled a hearing for March 12, 2018 to discuss the parties' request that the court prematurely dissolve the civil domestic violence restraining order, which otherwise

---

[5]    Jennifer, Joseph, Meir, Freshbrook and their respective counsel each signed the proposed stipulated judgment.

[6]    Judge Lynn Healey Scaduto.

7

would remain in effect until August 20, 2018.[7]  After hearing Jennifer's and Joseph's testimony about their contacts with one another over the previous year , the court denied the request to dissolve the civil restraining order prematurely, noting that Jennifer continued "to seem afraid" of Joseph, and Joseph continued "to be resentful" of Jennifer.

Jennifer's mother, Sheryl Mandelbaum, an attorney, argued that the court's refusal to dissolve the restraining order did not affect the court's ability to enter the stipulated judgment because the settlement required only that Jennifer request dissolution of the restraining order and cooperate with Joseph to seek dissolution of the order, both of which Jennifer had done.[8] At the request of Joseph's counsel, the court agreed to hold the stipulated judgment for 10 days to enable Joseph to discuss with his counsel whether to proceed with the stipulated judgment in light of the court's refusal to dissolve the civil domestic violence restraining order prematurely.  The court ruled that if Joseph did not notify the court within 10 days of any objections to entry of the stipulated judgment, the court would sign and file the stipulated judgment at that time.

Joseph did not file any objections.  Accordingly, on March 23, 2018 the family court signed and entered the stipulated judgment of dissolution memorializing the terms of the parties' September 2017 settlement.  The stipulated judgment states:

---

[7]  Neither the court nor the parties addressed the criminal domestic violence restraining order issued at Joseph's October 16, 2015 plea hearing, which also had an August 20, 2018 expiration date.

[8]  Sheryl appeared at the March 12, 2018 hearing as Jennifer's counsel.

"The court finds that each Party and Party Claimant acknowledges that he or she respectively (i) is fully informed as to the facts relating to the subject matter of this Judgment, and as to the rights and liabilities of both Parties; (ii) enters into this Judgment voluntarily, free from fraud, undue influence, coercion, or duress of any kind; and (iii) has read, considered, and understands each provision of this Judgment."

E. *Joseph's Motion To Set Aside the Settlement Agreement and the Stipulated Judgment*

On March 22, 2019 Joseph moved to set aside "portions, or in the alternative, the entirety" of the settlement agreement and the stipulated judgment. Joseph asked the court to award him all or half of the sale proceeds Jennifer received from the July 2018 sale of the June Street residence for $6,010,000. Joseph also sought sanctions against Jennifer for her "threats, coercion and undue duress and for frustrating settlement leading to the filing" of Joseph's motion.

Joseph claimed he agreed to the settlement and stipulated judgment "after years of intimidation and fear tactics and extreme duress and undue influence," primarily directed at Meir. Joseph alleged Jennifer and Sheryl had threatened to ruin Meir's personal and professional lives, and to make any visitation between Joseph and the children difficult, if not impossible, if Joseph did not agree to Jennifer's settlement terms. Joseph also alleged Jennifer had tricked him into signing a grant deed transferring title to the June Street residence from Joseph's separate property to joint tenancy with Jennifer, and had turned "the Jewish community" against Joseph by falsely accusing him of refusing to give Jennifer a Get. Joseph claimed he had been assaulted by a man at a restaurant at Jennifer's behest in

9

January 2016.  The man allegedly grabbed Joseph by the neck, choked him, threatened to kill him, and insisted that Joseph give Jennifer a Get.  Joseph stated, "But for Jennifer's undue duress, extreme pressure and fear tactics, I would never have agreed to such an unequal division of assets."

Joseph filed with his motion declarations from himself, Meir, and Joseph's settlement counsel.  Joseph's settlement counsel stated that on two occasions in 2016 Jennifer's then-counsel threatened that if the parties did not settle, Meir "could face jail time for tax evasion" and other negative consequences such as "serious tax liabilities to authorities in Israel and other countries."  Joseph's settlement counsel communicated the threats to Meir "but took no other action at that time since [Meir] was not [his] client."  Joseph also filed a list of witnesses from whom he sought to present live testimony at an evidentiary hearing on the motion, including himself, Jennifer, Meir, Sheryl, and the parties' respective settlement counsel.

Jennifer opposed Joseph's motion and likewise requested sanctions.  Jennifer argued the parties had negotiated the settlement through counsel after many revisions and extensive discovery in the family court, and that Joseph "had signed the Deal Memo freely, voluntarily, and without duress or coercion." Jennifer contended Joseph only sought to set aside the stipulated judgment to "punish" Jennifer for not acquiescing to Joseph's recent visitation demands.

Jennifer attached to her declaration exhibits she argued showed Joseph had not been "bullied" or "harassed" into signing the settlement, but instead demonstrated Joseph believed he had obtained a more favorable outcome in the settlement than Jennifer had.  Sheryl submitted a declaration stating that

10

Joseph's and Meir's accusations about her threats to Meir were "complete fabrications and I dispute each and every statement contained therein. . . . [¶] At no time did I ever threaten [Joseph] or Meir Gurvitz, either directly or indirectly, that I would report them to the authorities unless they settled with [Jennifer]."

Joseph's reply argued that Jennifer's opposition "does not refute the threats made towards [Joseph] and the bad faith tactics used to improperly secure a patently unfair and inequitable settlement," and "ignore[s] the fact that the pressure of [Jennifer's] undue duress on [Joseph] had never ceased." Joseph submitted a second declaration from himself and a second declaration from his settlement counsel. Joseph's settlement counsel acknowledged being "aware of what [he] could characterize as threats in 2016, during my participation in the matter," but stated he "was not privy" to all of the claimed instances of alleged duress.

F. *The Hearing on and Order Denying Joseph's Motion*

On May 30, 2019 the parties appeared at a hearing on Joseph's motion. Joseph's counsel stated that Jennifer's responsive papers did not "refut[e] any of the actual threats" described in Joseph's papers. Jennifer's counsel responded, "We disagree with and say completely opposite of what [Joseph says] what happened." Joseph's counsel asserted that Joseph had requested a live evidentiary hearing "so that the court can understand the extreme distress that went on" during settlement negotiations.

The court stated it would consider further the parties' papers, and either "rule on the papers and find good cause that there's no need to hear from the witnesses" Joseph had identified, or schedule a long cause hearing to take live testimony. Neither

counsel objected to the court's plan. Joseph's counsel stated, "All we want is an order and a judgment after a fair trial. We want equity and justice. That's it. Just wants justice. Thank you."

Later the same day, the court issued a minute order denying Joseph's request for an evidentiary hearing and denying the motion. With respect to the hearing request, the court ruled, "After further review of the three rounds of papers the parties[ ] filed in connection with the instant request for order and the record in the case, the court declines to conduct an evidentiary hearing, finding that there is good cause not to hear live testimony because the material facts are not in controversy."

With respect to the motion, the court ruled, "[Joseph's] contention that he should not be held to the terms he agreed to in the deal memorandum and the stipulated judgment that followed six months later cannot be reconciled with the terms of the agreed-upon judgment itself, the record before the court and the case law regarding duress." The court continued: "Here, it is beyond dispute that respondent was represented by the same experienced family law lawyer throughout the settlement negotiations, up to and including the entry of the stipulated judgment. It is also undisputed that more than six months passed between when the parties agreed to the deal memorandum terms and when the stipulated judgment was entered by the court. It is also undisputed that, before entering the judgment on March 23, 2018, the court conducted a March 12, 2018, hearing on the parties' joint request . . . to terminate early an existing domestic violence restraining order that then had a few months remaining before it expired. . . . [¶] The court declined to terminate the restraining order early and gave both parties 10 days to tell the court if there was 'some reason why the

judgment should not be signed' by the court as proposed by the parties.  Neither party asserted any such reason."

The court credited Joseph's, Meir's, and Joseph's counsel's declarations, and found that Jennifer did not dispute Joseph's threat allegations:  "[Joseph's] declaration, along with that of his father and his former counsel . . . all support the conclusion that [Jennifer] and/or her family members and counsel communicated to [Joseph] and/or his family members and counsel that certain of [Meir's] financial dealings might, if publicly exposed, be embarrassing for him or even expose him to criminal liability. . . . [Jennifer] seems not to deny any of this."

The court concluded, however, that "the cat was out of the bag" about Meir's alleged financial shenanigans by June 2016 "when [Meir's] financial dealings were at issue" in the three-day evidentiary hearing on Jennifer's request for support orders.  The court further observed that Joseph's counsel's declaration "makes clear that [counsel] had first-hand knowledge for more than a year before the court entered the stipulated judgment of the same types of threats [Joseph] now asks the court to find deprived him of the ability to do anything but give in to [Jennifer's] demands.  If [Joseph] felt his lawyer was an instrument of the coercion or was just not being a zealous enough advocate, he was free to hire another lawyer in the six months that passed after the Deal Memorandum was negotiated."

The court ruled that the plain language of the stipulated judgment refuted Joseph's arguments that he did not know Jennifer would sell the June Street residence for several million dollars, that he did not receive any sale proceeds, and that he did not receive any assets in the settlement.  The court "conclude[d] that the record before it cannot support a reasonable conclusion

that [Joseph] had no alternative but to succumb to [Jennifer's] demands."

The court denied Joseph's motion in its entirety, and denied Jennifer's request for sanctions. Joseph filed a timely appeal from the order.[9]

## DISCUSSION

Joseph's sole argument on appeal is that the family court abused its discretion by declining to hold an evidentiary hearing on Joseph's motion to set aside the settlement agreement and the stipulated judgment. We agree that the family court prejudicially erred by denying Joseph's request for an evidentiary hearing.

A.  *Applicable Law and Standard of Review*

"At a hearing on any . . . notice of motion brought pursuant to [the Family Code], absent a stipulation of the parties or a finding of good cause . . . , the court shall receive any live, competent testimony that is relevant and within the scope of the hearing . . . ." (Fam. Code,[10] § 217, subd. (a); see also Cal. Rules of Court, rule 5.92(a)(1)(A) [in family law proceedings, "request for order" has same meaning as "notice of motion"].) California Rules of Court, rule 5.113(b) sets forth the factors "in addition to the rules of evidence" a court must consider in making a finding of good cause to refuse to receive live testimony under section 217:  "(1) Whether a substantive matter is at issue—such as . . .

---

**9**     Jennifer moved to dismiss Joseph's appeal as untimely filed. We denied Jennifer's motion on October 29, 2019.

**10**     All undesignated statutory references are to the Family Code.

14

the characterization, division, or temporary use and control of the property or debt of the parties; [¶] (2) Whether material facts are in controversy; [¶] (3) Whether live testimony is necessary for the court to assess the credibility of the parties or other witnesses; [¶] (4) The right of the parties to question anyone submitting reports or other information to the court; [¶] (5) Whether a party offering testimony from a non-party has complied with Family Code section 217(c)[11]; and [¶] (6) Any other factor that is just and equitable." If the court makes a finding of good cause to exclude live testimony, "it must state its reasons on the record or in writing. The court is required to state only those factors on which the finding of good cause is based." (Cal. Rules of Court, rule 5.113(c).)

"Generally, where a trial court has discretionary power to decide an issue, an appellate court is not authorized to substitute its judgment of the proper decision for that of the trial judge. . . . 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'" [Citations.] The burden is on the complaining party to establish abuse of discretion." (*In re Marriage of Rosevear* (1998) 65 Cal.App.4th 673, 682.)

---

11      Section 217, subdivision (c), requires a party seeking to present live testimony from witnesses other than the parties to file and serve before the hearing a witness list with a brief description of the anticipated testimony.

B.      *The Family Court Abused Its Discretion by Denying Joseph's Request for an Evidentiary Hearing*

The family court abused its discretion by finding good cause to refuse to receive live testimony based on its conclusion that the facts material to Joseph's motion were not in controversy.  Four of the six factors rule 5.113(b) requires the court to consider in making a finding of good cause to decline to receive live testimony weighed against a finding of good cause.

First, a substantive matter was at issue in Joseph's motion—the division of the parties' property.  (See Cal. Rules of Court, rule 5.113 (b)(1) [court must consider "[w]hether a substantive matter is at issue—such as . . . the characterization, division, or temporary use and control of the property or debt of the parties"].)  Joseph's motion sought redistribution of the proceeds of the sale of the June Street residence.  Joseph argued the court should award him either all or half of any sums Jennifer had received from the sale of the property.

Second, the parties' declarations conflicted on facts material to the motion.  (See Cal. Rules of Court, rule 5.113(b)(2) [court must consider "whether material facts are in controversy"].)  Joseph asserted Jennifer's orchestrated assault and Jennifer's and Sheryl's threats forced Joseph to capitulate to Jennifer's settlement demands.  Meir alleged Sheryl had threatened him directly.  Jennifer denied threatening Joseph and denied Joseph experienced duress during the settlement negotiations; she also "dispute[d] each and every statement contained" in Joseph's motion and declarations.  Sheryl described Joseph's and Meir's declarations as "complete fabrications," and denied threatening either of them.

16

Third, the parties' conflicting declarations demonstrated a need "for the court to assess the credibility of the parties [and] other witnesses." (See Cal. Rules of Court, rule 5.113(b)(3).) While the court had heard Jennifer and Joseph testify at the March 12, 2018 hearing on the request to dissolve the civil domestic violence restraining order, the court did not preside over the evidentiary hearing on Jennifer's request for support orders during which the witnesses addressed Meir's finances and financial arrangements with Joseph, including regarding the June Street residence. The court therefore had not previously heard the parties' live testimony on the issues underlying the alleged threats and duress or assessed the witnesses' credibility on those issues.

Fourth, Joseph had complied with section 217, subdivision (c), by filing and serving with his motion a list of witnesses from whom he sought to present live testimony with a brief description of each witness's anticipated testimony. (See Cal. Rules of Court, rule 5.113(b)(5) [court must consider "whether a party offering testimony from a non-party has complied with Family Code section 217(c)"].)

These four factors weighed against a finding of good cause to refuse to receive live testimony, and nothing in the record demonstrates that the other factors justified denying Joseph's request for an evidentiary hearing. (See Cal. Rules of Court, rule 5.113(b)(4) [court must consider "right of the parties to question anyone submitting reports or other information to the court"]; Cal. Rules of Court, rule 5.113(b)(6) [court must consider "any other factor that is just and equitable"].) We thus conclude the family court abused its discretion by finding good cause to decline to receive live testimony.

17

C.    *The Error Was Prejudicial*

The family court's error in refusing to receive live testimony on Joseph's motion was prejudicial.  The family court seemingly believed Joseph's contentions that Jennifer and Sheryl had threatened Joseph and Meir, but nevertheless concluded the alleged threats did not and could not demonstrate duress sufficient to set aside the settlement agreement and the stipulated judgment.  In essence, the court found that nothing Joseph or any other witness might say at an evidentiary hearing could warrant granting Joseph's motion.

A conclusion that live testimony could not under any circumstances affect the outcome of Joseph's motion cannot be reconciled with the strong policy favoring reliance on live testimony in family law proceedings.  (See *In re Marriage of Binette* (2018) 24 Cal.App.5th 1119, 1126-1127 ["The purpose of section 217 is to encourage reliance on live, rather than written, testimony in family law proceedings"]; *In re Marriage of Swain* (2018) 21 Cal.App.5th 830, 838 ["The history of section 217 and the case law that preceded it reflect a concern for the value of live testimony rather than deciding substantive motions based upon competing declarations"]; see also *Elkins v. Superior Court* (2007) 41 Cal.4th 1337.)  Moreover, a claim of duress requires a court to evaluate the effect of alleged threats "on the state of the threatened person's mind." (*In re Marriage of Baltins* (1989) 212 Cal.App.3d 66, 84 ["[t]o determine whether a contract . . . was the product of duress, the courts look not so much to the nature of the threats, but to their effect on the state of the threatened person's mind"]; see also *Krantz v. BT Visual Images, L.L.C.* (2001) 89 Cal.App.4th 164, 176 ["'[t]he question of duress . . . is a factual

question; the existence of duress always depends upon the circumstances'"].)

Joseph's intensely factual duress claims, the effect of the alleged threats and duress on Joseph's state of mind, and the parties' and witnesses' contradictory statements could not be resolved based upon competing declarations. Before concluding that Joseph had not demonstrated the alleged duress compelled him to surrender to Jennifer's demands, and that Joseph would have acted differently had he truly been under duress, the family court should have heard and assessed Joseph's live testimony about the effect of the alleged threats on his state of mind, as well as heard and assessed the live testimony of the other witnesses. After an evidentiary hearing, the court may find Joseph's contentions do not justify setting aside the settlement agreement and the stipulated judgment. Or the court may find that they do. But before deciding the motion, section 217 requires the court to evaluate Joseph's duress claims, and the parties' and other witnesses' credibility, by receiving live testimony.

## DISPOSITION

The May 30, 2019 order denying Joseph's motion to set aside the settlement agreement and the stipulated judgment is reversed.  The case is remanded to the superior court with directions to vacate the order denying Joseph's motion to set aside the settlement agreement and the stipulated judgment, to hold an evidentiary hearing on the motion, and to enter a new order(s) as appropriate following the evidentiary hearing.  Joseph shall recover his costs on appeal.


McCORMICK, J.[*]


We concur:


SEGAL, Acting P. J.


FEUER, J.

---

[*]     Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.